2001 UT 35

STATE of Utah, Plaintiff and Appellee,

v.

Paul Michael WACH, Defendant and Appellant.

No. 990940.

Supreme Court of Utah.

April 17, 2001.

Mark L. Shurtleff, Att'y Gen., Marian Decker, Asst. Att'y Gen., Susan Hunt, Salt Lake City, for plaintiff.

Linda M. Jones, Lisa J. Remal, Salt Lake City, for defendant.

RUSSON, Associate Chief Justice:

¶ 1 Defendant Paul Michael Wach ("Wach") appeals from convictions of aggra-

vated kidnaping, a first degree felony, in violation of Utah Code Ann. § 76–5–302 (1999), and assault, a class Å misdemeanor, in·violation of Utah Code Ann. § 76–5–102 (1999). Wach contends that his convictions should be reversed because (1) the trial court committed prejudicial error by failing to remove two prospective jurors for cause, and (2) the trial court failed to declare a mistrial after evidence was introduced at trial in violation of rule 404(b) of the Utah Rules of Evidence. We affirm.

## BACKGROUND

### I. FACTS

¶ 2 On January 20, 1999, the State charged Wach with the assault and aggravated kidnaping of his mother, Bobbie Wach Glen ("Bobbie"). At trial, Bobbie testified as follows:

¶ 3 In January 1999, Wach was living with Bobbie in her split-level home. On the evening of January 13, 1999, Bobbie arrived home at approximately 9:30 p.m. after working a fourteen-hour shift. Upon entering the house, Bobbie went to the back deck where she found Wach and two friends smoking cigarettes and drinking "Schnapps and beer." Bobbie told Wach that it was late and that his friends would have to go home. However, while Bobbie changed into her pajamas, Wach and his friends went downstairs.

¶ 4 A short while later, realizing that Wach's friends were still in the house, Bobbie went downstairs and told Wach, "I don't mean to be rude but you guys are going to have to leave. It's getting late." Wach, feeling "humiliated and embarrassed ... by [his] mom telling [him] what to do," began forcing Bobbie up the stairs by pushing her and hitting her with his fists. Upon reaching the top of the stairs, Wach hit Bobbie "a good one on the side of the head and then ... started hitting [her] in the face and the forehead." Bobbie pleaded with Wach to stop, but Wach continued hitting her until she fell over a chair and onto the floor.

¶ 5 While Bobbie was on the floor, Wach kicked her on the shoulder, called her derogatory names, "slugg[ed][her] in the face and

the head," and then inexplicably began biting her ears. At some point, one of Wach's friends reached down to help Bobbie, but Wach responded by saying, "This is personal. Step out of it." Bobbie recalled that the hand promptly "disappeared" before she could take it.

¶ 6 Thereafter, Wach pulled Bobbie up off the floor by her hair and told her that she was going to go with him to take his friends home. Bobbie told Wach that she "didn't want to go," but Wach replied, "Yes, you are. You are." Accordingly, Bobbie started to walk into her bedroom to get some shoes, whereupon Wach resumed the assault, "slugg[ing] [Bobbie] in the back of the head," causing her to fall over a chair, breaking it in half. Wach hit Bobbie "a couple more times" and then grabbed her by the neck and arm and led her outside to his car. Bobbie was wearing no underwear or shoes, only her cotton pajamas.

¶ 7 As Wach was opening the car door, Bobbie broke loose and ran to the neighbor's house and up the driveway. Before she could reach the front door, however, Wach tackled her and began hitting her, biting her ears, and pulling her hair. Wach then pulled Bobbie up off the ground, dragged her down the driveway, and forced her into his car. Unbeknownst to Wach, Bobbie had a house security alarm hanging on a chain around her neck under her clothes that could be activated by simultaneously depressing two buttons. As Bobbie got into the car, she depressed the buttons, causing the house security alarm to go off and summoning the police.

¶ 8 Wach then drove a short distance to drop off his friends. As Wach's friends got out of the car, they invited Bobbie to go with them. Bobbie stated that she wanted to go with them, but Wach said, "[N]o, you're not. You don't want to." Because she was afraid Wach "was going to hurt [her] again," Bobbie stayed in the car. Wach then shut the car door and drove back to Bobbie's house.

¶ 9 As they approached the house, Wach noticed that a police car was parked in the driveway and therefore drove past the house to a local supermarket where he parked the car. At the supermarket, Wach told Bobbie that "none of this would have happened if

[she] would have kept [her] fucking mouth shut." Wach also stated that he was mad at Bobbie because she had "broke[n] his fist." Thereafter, Wach displayed a knife with a six-inch blade and, while thumbing the blade, turned to Bobbie in the back seat and said, "[I] ought-ta"—but never finished his sentence. Wach then started the car and drove back to Bobbie's house.

¶ 10 As they approached the house the second time, Wach noticed that the police were still there, and he therefore drove to "some really slum[my] area" that Bobbie was unfamiliar with and parked the car near some apartments. By this time, Bobbie's head, ears, and legs were "killing" her, and she was "freezing cold," "shaking," and "afraid for [her] life." Wach shut off the car, got out, and did not return for about forty minutes. When Wach returned, he "[tried] to apologize," repeatedly telling Bobbie that "he was sorry that he had to hit [her]." Bobbie said nothing in response, but when Wach "got mad because [she] didn't say anything," Bobbie apologized to him. Wach replied, "[T]hat's right."

¶ 11 Wach then drove to Bobbie's house a third time. This time the police were gone, and therefore Wach parked the car and allowed Bobbie to go inside. Bobbie rested on her bed for twenty to thirty minutes because she was "really hurting" and could feel "water in [her] ear" when she moved her head. The pain was so intense that Bobbie thought she "was going to die." While she was lying on her bed, Bobbie's sister Mona called. Bobbie told Mona about the assault perpetrated against her by Wach, and Mona said that she was coming over.

¶ 12 Mona arrived approximately one-half hour later with Bobbie's mother, another sister, and the police. Bobbie was waiting outside because she was afraid Wach would not allow her to leave. Bobbie, however, refused to speak with the police because "the beating was over at that time" and Wach "had told [her] before that if the police were involved, then [she] was dead." After Bobbie told her sister that she "was afraid for the police to be involved," the police left.

¶ 13 Bobbie spent the rest of the night at her mother's house. The next day, Bobbie went to the hospital, where the incident was eventually reported to the police.

¶ 14 In contradiction to Bobbie's testimony, Wach testified at trial that he never "punched" or "kicked" Bobbie, although he did "hit her in the forehead with the palm of [his] hand" and "slapp[ed]" her both downstairs and in the kitchen. Moreover, Wach testified that Bobbie's fall was caused by her tripping on the stair railing as she walked into the living room. Wach claimed that he offered to help Bobbie up off the floor, but that she refused his help. Wach further testified that Bobbie then stood up, immediately put on her slip-on shoes, and voluntarily accompanied him to take his friends home. As they were walking to the car, Wach remembered guiding Bobbie with his arm around her shoulder because she was mistakenly "drifting" toward another car parked on the street.

¶ 15 Following a two-day jury trial, Wach was convicted of assault and aggravated kidnaping. Thereafter, the trial court sentenced Wach to an indeterminate prison term of ten years to life for aggravated kidnaping, and a term of 365 days for assault, with the terms to run concurrently.

## II. PROCEDURAL HISTORY

### A. Voir Dire

¶ 16 Prior to trial, the trial court conducted voir dire [1] of prospective jurors. Initial voir dire by the trial court involved ascertaining whether any of the prospective jurors had been involved in some kind of an assault, or had any relatives or friends who had been assaulted. The trial court's question elicited the following exchange with prospective juror No. 3:

[Juror No. 3]: I was the victim of aggravated assault three times. I had my car vandalized. I was burned with a car lighter while driving. I do have a protective order now. And that happened about two years ago.

THE COURT: Was this with a boyfriend or—

[Juror No. 3]: It was an ex-roommate.

THE COURT: An ex-roommate?

[Juror No. 3]: Yes.

THE COURT: A male or female?

[Juror No. 3]: Female.

THE COURT: She assaulted you?

[Juror No. 3]: Yes.

THE COURT: Do you think that your involvement—did anything come of it?

[Juror No. 3]: We went to court and all of the charges against her were dropped. I did obtain a protective order and I haven't had contact with her since.

THE COURT: Uh-huh. That experience, would that affect your ability to be fair and impartial?

[Juror No. 3]: No, Your Honor. It won't.

THE COURT: You think you can do it without any problem?

[Juror No. 3]: Yes.

THE COURT: Okay. Thank you....

Wach's defense counsel requested no additional voir dire of juror No. 3 beyond that conducted by the trial court.

¶ 17 The trial court also asked the prospective jurors whether they "had any experience in terms of observing a criminal offense." This question elicited the following exchange with prospective juror No. 21:

[Juror No. 21]: I ... have worked in hospitals for twenty years and—

THE COURT: Uh-huh.

[Juror No. 21]: And I feel pretty strongly about that and I don't—well, I guess I am biased.

THE COURT: I can appreciate that. Can you set it aside?

[Juror No. 21]: (No response)

THE COURT: If you're selected as a juror, can you listen to the evidence? Again, you know, nobody is guilty of anything at this stage. We have a great Constitution that says we all have a pre-

1. The term "voir dire" denotes the "preliminary examination of a prospective juror by a judge or lawyer to decide whether the prospect is quali-fied and suitable to serve on a jury." *Black's Law Dictionary* 1569 (7th ed.1999).

sumption of innocence until proven guilty beyond a reasonable doubt and that is where we ask eight jurors to listen to the evidence and, based upon the evidence, reach whatever conclusion they deem appropriate. It has to be unanimous. And that will be discussed more as this case goes on. Can you or can you not?

[Juror No. 21]: I believe I could.

THE COURT: You think you could?

[Juror No. 21]: Yes.

THE COURT: Okay.

Again, Wach's defense counsel requested no additional voir dire of juror No. 21 beyond that conducted by the trial court.

¶ 18 At the conclusion of voir dire, Wach asked the trial court to remove for cause prospective jurors No. 3 and No. 21. The trial court denied both for-cause challenges, and therefore, Wach used two of his four peremptory challenges to remove both prospective jurors. Wach then used his remaining two peremptory challenges to remove prospective jurors No. 7 and No. 17, neither of whom he had challenged for cause. Wach did not make any for-cause challenges to the jurors ultimately seated in his case.

### B.   Motion for Mistrial

¶ 19 Wach's defense counsel filed a pretrial motion in limine to suppress evidence of Wach's prior bad acts and crimes in accordance with rule 404(b) of the Utah Rules of Evidence. The State stipulated to the motion, and the trial court granted it. However, during direct examination of the victim, Bobbie Wach–Glen, the prosecutor elicited details of Wach's alleged assault and kidnaping. In doing so, the prosecutor asked Bobbie if she tried to summon help during the assault. Bobbie responded by stating that she attempted to summon the police by activating a security alarm that hung on a chain around her neck when she was getting into Wach's car. In further describing the alarm, Bobbie made the following statement:

It's a little round alarm. It's about the size of a half dollar. It has two—two little buttons and you have to push them at the same time. *And I often wore it around my neck when [Wach] was around.*

And—and you have to push them and the alarm goes off.

(Emphasis added.)

¶ 20 Wach's defense counsel did not object when the above statement was made. However, based on the statement, Wach moved for a mistrial at the conclusion of Bobbie's testimony. Wach argued that Bobbie's statement violated the parties' stipulation not to introduce evidence of prior bad acts—evidence disallowed under rule 404(b) of the Utah Rules of Evidence—because the obvious implication of the statement was that Bobbie feared her son and felt in danger when he was around.

¶ 21 In responding to the motion, the trial court determined that although the statement did violate the parties' stipulation not to introduce evidence of prior bad acts, it was "innocuous" and did not prejudice Wach. Therefore, the trial court denied the motion for a mistrial. Following its denial of the motion, the trial court offered to remedy the matter with a curative instruction; however, Wach's counsel declined the instruction, arguing that it would likely emphasize the matter to the jury. The trial court agreed and determined that a curative instruction would not be appropriate. Thereafter, the trial court, out of the presence of the jury, reprimanded the witness, reminding her to avoid discussing Wach's prior bad acts.

### ANALYSIS

¶ 22 On appeal, Wach raises two claims of error: (1) the trial court committed reversible error by failing to remove for cause prospective jurors No. 3 and No. 21, and (2) the trial court failed to declare a mistrial following Bobbie's improper remark made during direct examination. We will address these claims seriatim.

### I.   VOIR DIRE

¶ 23 Wach argues that the trial court erred during voir dire by failing to remove prospective jurors No. 3 and No. 21 for cause. Wach also argues that since jurors No. 3 and No. 21 should have been removed for cause, it was reversible error to compel him to use

two of his four peremptory challenges to remove the two prospective jurors.

¶ 24 In *State v. Menzies*, 889 P.2d 393 (Utah 1994), we held that a per se reversible error does not occur whenever a party is compelled to use a peremptory challenge to remove a jury member that the trial court erroneously failed to remove for cause.[2] *Id.* at 400. *Menzies* held that to prevail on a claim of error based on the trial court's failure to remove a prospective juror for cause, a defendant must demonstrate prejudice, *viz.,* show that a member of the actual jury that sat was partial or incompetent. *Id.* at 398. Accordingly, in determining whether the trial court committed reversible error in this case, we must apply a two-part test: First, we must determine whether the trial court committed legal error by failing to excuse for cause prospective jurors No. 3 and No. 21. Second, we must determine whether the trial court's failure to strike the prospective jurors prejudiced Wach.

### A. Trial Court's Refusal to Grant For-Cause Challenges

¶ 25 We start with the traditional and sound rule that a trial court's determination of whether to excuse a prospective juror for cause should not be reversed absent an abuse of discretion. *See Jenkins v. Parrish*, 627 P.2d 533, 536 (Utah 1981); *State v. Dixon*, 560 P.2d 318, 319 (Utah 1977). We review such a decision with just deference because of the "trial judge's somewhat advantaged position in determining which persons would be fair and impartial jurors." *Jenkins*, 627 P.2d at 536. We view the trial court's exercise of discretion, however, "in light of the fact that it is a simple matter to obviate any problem of bias simply by excusing the prospective juror and selecting another." *Id.*

---

**2.** *Menzies* overturned a line of cases spawned by *Crawford v. Manning*, 542 P.2d 1091 (Utah 1975), that required automatic reversal when a party was compelled to exercise a peremptory challenge to remove a juror who should have been removed for cause. *See, e.g., State v. Bishop*, 753 P.2d 439 (Utah 1988); *State v.. Jones*, 734 P.2d 473 (Utah 1987); *Jenkins v. Parrish*, 627 P.2d 533 (Utah 1981); *State v. Bailey*, 605 P.2d 765

¶ 26 Rule 18(e)(14) of the Utah Rules of Criminal Procedure sets forth the appropriate standard under which Wach's claim that prospective jurors No. 3 and No. 21 should have been dismissed for cause is to be tested:

(e) The challenge for cause is an objection to a particular juror and may be taken on one or more of the following grounds:

. . .

(14) that a state of mind exists on the part of the juror with reference to the cause, or to either party, which will prevent him from acting impartially and without prejudice to the substantial rights of the party challenging [the juror]. . . .

¶ 27 Once statements are made during voir dire that "facially raise a question of partiality or prejudice, an abuse of discretion occurs unless the challenged juror is removed by the court or unless the court or counsel investigates further and finds the inference rebutted." *State v. Bishop*, 753 P.2d 439, 451 (Utah 1988). Rebuttal is accomplished by showing that a juror's statement was "merely the product of a 'light impression' and not one that would 'close the mind against the testimony that may be offered in opposition.' " *Id.* (quoting *State v. Bailey*, 605 P.2d 765, 768 (Utah 1980)). With this standard in mind, we turn our attention to the disputed for-cause rulings in the instant case.

### 1. Prospective Juror No. 3

¶ 28 Wach argues that the trial court erred by failing to remove for cause prospective juror No. 3 because she indicated during voir dire that she had been the victim of a similar crime. Specifically, juror No. 3 disclosed that she had previously been the victim of an assault.

---

(Utah 1980). To the extent the above cases apply *Crawford's* automatic reversal rule, they are no longer good law. However, the above cases are still good law in regard to their analysis of unrelated issues, such as the proper standard to consider in determining whether a trial court abused its discretion in failing to remove a prospective juror for cause.

¶ 29 As the court of appeals correctly noted in *State v. Brooks*, 868 P.2d 818, 823 (Utah Ct.App.1994), a question of potential bias arises when a prospective juror indicates that he or she has been the victim of a similar crime. Therefore, as explained above, when such a question arises, the court or counsel must investigate further to determine if the juror can be impartial despite the past experience. *See Bishop*, 753 P.2d at 451. If, after further investigation into the juror's state of mind, the trial court is satisfied that the juror can act impartially, the trial court does not abuse its discretion by refusing to remove the prospective juror for cause. *See id.* at 451–52.

¶ 30 In this case, Wach correctly notes that because juror No. 3 disclosed during voir dire that she had previously been the victim of an assault, a facial question was raised concerning her impartiality. However, after juror No. 3 made the above disclosure, the trial court conducted a rehabilitative inquiry. Specifically, the trial court inquired into the circumstances of the assault, asking juror No. 3 whether the crime was perpetrated against her by a family member, whether the perpetrator was male or female, and whether the incident had been resolved. Juror No. 3 responded that unlike the case at hand, she was not assaulted by a family member, the perpetrator was female, and the incident had been resolved for over two years. Thereafter, the trial court asked juror No. 3 whether her experience would "affect [her] ability to be fair and impartial." Juror No. 3 responded unequivocally, "No, Your Honor. It won't." The trial court further queried, "You think you can do it without any problem?" Juror No. 3 again affirmatively responded, "Yes."

¶ 31 In light of the above, none of prospective juror No. 3's responses to the trial court's rehabilitative inquiry indicated any bias as a result of having been the victim of a similar crime. Rather, juror No. 3's unequivocal responses indicated that she could act in an impartial manner and had an open mind regarding the testimony to be offered despite her past experience. Moreover, juror No. 3's responses also indicated that the circumstances of her past experience were different than those in the present case in many important respects. Therefore, the trial court's rehabilitative inquiry in this case was sufficient to rebut any question of bias that was raised by the fact that juror No. 3 had been the victim of a similar crime. Accordingly, the trial court did not abuse its discretion in refusing to remove prospective juror No. 3 for cause.

2. Prospective Juror No. 21

¶ 32 Wach also argues that the trial court erred by refusing to remove prospective juror No. 21 for cause because she indicated during voir dire that as a result of her employment at a hospital, she had "strong feelings" about criminal behavior and was therefore "biased." The trial court asked juror No. 21 if she could "set [her bias] aside," to which inquiry juror No. 21 gave no response. The trial court then explained that criminal defendants have a "presumption of innocence until proved guilty beyond a reasonable doubt" and asked juror No. 21 a second time if she could set aside her bias and return an impartial verdict. Juror No. 21 responded, "I believe I could."

¶ 33 It is not enough if a juror believes that he or she can be impartial and fair. Indeed, this court has previously noted that "[a] statement made by a juror that she intends to be fair and impartial loses much of its meaning in light of other testimony and facts which suggest a bias." *Jenkins v. Parrish*, 627 P.2d 533, 536 (Utah 1981). Accordingly, "[t]he court, not the juror, must determine a juror's qualification." *State v. Jones*, 734 P.2d 473, 475 (Utah 1987) (citing *State v. Brooks*, 631 P.2d 878, 884 (Utah 1981)).

¶ 34 In this case, although juror No. 21 stated that she "believe[d]" she could remain fair and impartial, her statement does not alter the fact that she indicated that as a result of her experience working at a hospital she had witnessed numerous instances of criminal behavior and was therefore "biased." The trial court's one question, although asked twice, was not sufficient to rebut this inference of bias. *See State v. Bailey*, 605 P.2d 765, 768 (Utah 1980) (holding that court's "one question" was insuffi-

cient to rebut prospective juror's statement that he would favor police officer's testimony). Hence, the trial court had insufficient evidence upon which to base a conclusion that prospective juror No. 21 was not biased and abused its discretion in failing to remove her for cause.

### B. Harmless Error

¶ 35 Having determined that the trial court erroneously failed to remove prospective juror No. 21 for cause, we now examine whether the trial court's failure to remove the prospective juror prejudiced Wach.

¶ 36 Both the United States Constitution and the Utah Constitution guarantee an accused the right to a fair and impartial jury. *See* U.S. Const. amend. VI; Utah Const. art. I, § 12. Had prospective juror No. 21 sat on the jury that ultimately convicted Wach of assault and aggravated kidnaping, and had Wach properly preserved his right to challenge the trial court's failure to remove juror No. 21 for cause, the convictions would have to be overturned. *See State v. Baker,* 935 P.2d 503, 506 (Utah 1997).[3] However, juror No. 21 did not sit on the jury that convicted Wach because Wach exercised a peremptory challenge to remove her. Therefore, as explained above, any claim that the jury was not impartial must focus not on juror No. 21, but on the jury ultimately seated. *See State v. Menzies,* 889 P.2d 393, 398 (Utah 1994) (holding that the loss of a peremptory challenge does not equate with a violation of the right to an impartial jury, " '[s]o long as the jury that sits is impartial.' " (quoting *Ross v. Oklahoma,* 487 U.S. 81, 88, 108 S.Ct. 2273, 101 L.Ed.2d 80 (1988))). Specifically, to prevail on a claim of error based on the trial court's failure to remove prospective juror No. 21 for cause, Wach must demonstrate

prejudice, *viz.,* show that as a result of the loss of his peremptory challenge he was not able to remove another subsequently summoned juror who ultimately sat on the jury, and who was " 'partial or incompetent.' " *Baker,* 935 P.2d at 506 (quoting *Menzies,* 889 P.2d at 398).

¶ 37 In this case, Wach argues that he was prejudiced by the loss of his peremptory challenge because if he had not been compelled to remove prospective juror No. 21, he would have removed either juror No. 8 or juror No. 10, both of whom ultimately sat on the jury.[4] Wach contends that he was prejudiced by juror No. 8's retention because her "husband's cousin's husband" was a police officer and because she had a friend who worked as a detective in Heber, Utah. Wach contends that he was prejudiced by juror No. 10's retention because he was "young and inexperienced."

¶ 38 However, despite Wach's argument on appeal, there is nothing in the record to indicate that Wach made a timely objection to juror No. 8 or juror No. 10. Rule 18(c)(2) of the Utah Rules of Criminal Procedure provides that all "challenge[s] to an individual juror may be made *only before the jury is sworn to try the action,* except the court may, for good cause, permit it to be made after the juror is sworn but before any of the evidence is presented." (Emphasis added.) Moreover, rule 12(d) of the Utah Rules of Criminal Procedure provides that "[f]ailure of the defendant to timely raise defenses or objections or to make requests which must be made prior to trial or at the time set by the court shall constitute *waiver* thereof. . . ." (Emphasis added.)

¶ 39 In this case, the record indicates that Wach did not challenge either juror No. 8 or juror No. 10 for cause. In fact, Wach did not

---

3. In *Baker,* 935 P.2d at 510, we adopted a "cure or waiver rule" requiring a defendant whose for-cause challenge has been erroneously denied to cure that error by using a peremptory challenge, if one is available, to remove the juror or be held to have waived it.

4. In addition to arguing that he suffered prejudice as a result of his inability to remove prospective jurors No. 8 and No. 10, Wach also argues, relying on this court's plurality opinion

in *State v. Saunders,* 1999 UT 59, ¶ 55, 992 P.2d 951, that because the trial court made *two* erroneous for-cause rulings, those errors are sufficient on a "cumulative basis" to support reversal of the matter. However, we have already determined that the trial court did not abuse its discretion in refusing to strike prospective juror No. 3 for cause. Therefore, because this case involves only one erroneous for-cause ruling, Wach's cumulative error argument fails.

indicate in any way that he had any objection to juror No. 8 or juror No. 10 until after for-cause challenges were completed, peremptory challenges were exercised, the challenged jurors were excused from service, the jury was sworn in, and opening statements were made by the parties. At that point, Wach's defense counsel merely noted, "just for the record," that had she not expended a peremptory challenge to cure the trial court's erroneous for-cause ruling with respect to prospective juror No. 21, she would have used the peremptory challenge to remove either juror No. 8 or juror No. 10.

¶ 40 In light of the above, we conclude that Wach's failure to make any objection whatsoever to jurors No. 8 and No. 10 before the challenged jurors were excused from service and the jury was sworn to try the action constitutes a waiver, barring Wach from inquiring into the bias question. *See* Utah R.Crim. P. 12(d), 18(c)(2). This court has long maintained that a party cannot seek to reverse an unfavorable verdict by complaining of an error that the trial court could have corrected had it been timely informed of the error. *See, e.g., State v. DeMille*, 756 P.2d 81, 83 (Utah 1988) (holding that the defendant's failure to voir dire the jurors on a foreseeable issue of bias or object to the trial court's failure to cover the issue constituted a waiver of the bias question); *State v. Miller*, 674 P.2d 130, 131 (Utah 1983) (per curiam) (holding that the defendant, who had neither objected to voir dire nor sought permission to inquire further into a prospective juror's biases, had waived a claim later raised that jurors were biased).

¶ 41 Moreover, even if Wach had preserved the issue for appeal, he failed to meet his burden of proof on appeal. In an attempt to demonstrate prejudice, Wach merely notes that juror No. 8 knew two police officers—one was her "husband's cousin's husband" and the other was a friend—and juror No. 10 was "young and inexperienced." However, Wach did not demonstrate on the record, or on appeal, that jurors No. 8 and No. 10 could not act in a fair and impartial manner, or that " 'strong and deep impressions' " against Wach's case had formed. *State v. Bailey*, 605 P.2d 765, 767

(Utah 1980) (quoting *Reynolds v. United States*, 98 U.S. 145, 155, 25 L.Ed. 244 (1878)). Indeed, Wach erroneously focuses attention on the possibility of bias based on the fact that juror No. 8 knew two police officers and juror No. 10 was young and inexperienced, ignoring multiple assurances to the trial court that, as jurors, they would be fair, impartial, and objective to both sides.

¶ 42 Additionally, Wach has failed to demonstrate that he was not afforded an adequate opportunity to gain the information necessary to evaluate jurors No. 8 and No. 10. *See State v. Worthen*, 765 P.2d 839, 845 (Utah 1988) (noting that the fairness of a trial may depend upon the right of counsel to ask voir dire questions designed to discover and explore biases). Indeed, the record indicates that during voir dire Wach did not challenge juror No. 8 or juror No. 10 for cause, nor did he request any additional voir dire of the jurors beyond that conducted by the trial court.

¶ 43 Therefore, in light of the above, we conclude that even if Wach had properly preserved the issue for appeal, he has failed to show that the jury that ultimately sat in his case was partial or biased. Accordingly, the trial court's failure to remove prospective juror No. 21 for cause did not prejudice Wach and consequently does not constitute reversible error.

## II. FAILURE TO DECLARE MISTRIAL

¶ 44 Wach's second point is that the trial court erroneously failed to declare a mistrial following an improper statement made by the victim during direct examination. Specifically, Wach argues that Bobbie's statement that she wore a security alarm around her neck "when [Wach] was around" deprived him of the right to a fair trial by an impartial jury. Wach argues that the obvious implication of the statement was that Bobbie feared her son and felt in danger when he was around—evidence disallowed under rule 404(b) of the Utah Rules of Evidence. Moreover, Wach contends that if Bobbie's improper remark had not been revealed to the jury, "there is a substantial likelihood that the jury would

have returned a verdict more favorable to [him] on the aggravated kidnaping charge."

¶ 45 A trial court's denial of a motion for a mistrial will not be reversed absent an abuse of discretion. *State v. Robertson*, 932 P.2d 1219, 1230 (Utah 1997). In exercising its discretion, "the trial court should not grant a mistrial except where the circumstances are such as to reasonably indicate ... that a fair trial cannot be had" and that a mistrial is necessary in order to avoid injustice. *Burton v. Zions Coop. Mercantile Inst.*, 122 Utah 360, 364–65, 249 P.2d 514, 517 (1952). On appeal, the prerogative of a reviewing court is much more limited. *See id.* at 365, 249 P.2d at 517. Unless the trial court's determination "is plainly wrong in that the incident so likely influenced the jury that the defendant cannot be said to have had a fair trial, we will not find that the court's decision was an abuse of discretion." *Robertson*, 932 P.2d at 1231. We defer to the trial court's ruling because of the "advantaged position of the trial judge to determine the impact of events occurring in the courtroom on the total proceedings." *Id.*

¶ 46 In this case, Wach has failed to show that the trial court abused its discretion by refusing to grant a mistrial following Bobbie's improper[5] remark. Our review of the record indicates that Bobbie's statement about when she wore a security alarm was not elicited by the prosecutor, and was an isolated, off-hand remark, buried in roughly 244 pages of testimony. Moreover, the statement was not necessarily inflammatory, particularly given that the bulk of Bobbie's testimony describing the violent nature of the assault perpetrated against her by Wach was unchallenged at trial.[6] Indeed, given the totality of the evidence against Wach, and the reasonable inferences therefrom, it was not Bobbie's improper remark about when she wore a security alarm that caused the jury to convict Wach of aggravated kidnaping, but rather Bobbie's recounting of Wach's violent reaction when she told him it was time for his friends to go home, including hitting and kicking her head and body, and even biting her ears. Therefore, Bobbie's isolated remark about when she wore a security alarm did not render Wach's trial so unfair that the trial court was "plainly wrong" in denying Wach's motion for a mistrial.

## CONCLUSION

¶ 47 We conclude that the trial court's failure to remove for cause prospective juror No. 21 did not constitute reversible error. Moreover, we conclude that the trial court did not abuse its discretion by refusing to declare a mistrial following an improper statement made by the victim during direct examination. Accordingly, we affirm the jury's verdict and the trial court's subsequent sentence.

¶ 48 HOWE, C.J., DURHAM, DURRANT, and WILKINS, JJ., concur in Associate Chief Justice RUSSON'S opinion.

---

5. The State concedes on appeal that Bobbie's statement violated the parties' stipulation not to introduce evidence of prior bad acts in accordance with rule 404(b) of the Utah Rules of Evidence.

6. While Wach minimized his conduct below, he admitted that he was guilty of assaulting his mother. Indeed, Wach's trial counsel stated the following during closing arguments:

> I invite you to find [defendant] guilty of the assault charge. He told you himself on the stand he was guilty of that. That there was no excuse for his behavior. And you know that, too. I would sign that verdict form myself if the rules allowed it.