**2020 UT App 107**

# THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
DONNALD LEE WHYTOCK,
Appellant.

Opinion
No. 20180440-CA
Filed July 16, 2020

Third District Court, Salt Lake Department
The Honorable Elizabeth A. Hruby-Mills
No. 151907287

Andrew G. Deiss, John Robinson Jr., and Corey D.
Riley, Attorneys for Appellant

Sean D. Reyes and Nathan Jack, Attorneys
for Appellee

JUDGE RYAN M. HARRIS authored this Opinion, in which
JUDGES DAVID N. MORTENSEN and JILL M. POHLMAN concurred.

HARRIS, Judge:

¶1     A jury convicted Donnald Lee Whytock of raping his girlfriend's daughter and tampering with a witness. Whytock appeals both convictions, claiming that the trial court erred in denying his motion for a mistrial, and that his trial counsel rendered constitutionally ineffective assistance. We reject Whytock's arguments and affirm his convictions.

BACKGROUND[1]

¶2     In 2014, Whytock lived in an apartment with his girlfriend (Mother) and her three daughters. On one evening in August, Mother's oldest daughter—fourteen-year-old S.B.—went out with a friend, but returned a few minutes past her strict 10:00 p.m. curfew. Upon her return, both Mother and Whytock began "yelling" at her for missing curfew, and S.B. retreated to her bedroom. Mother followed her into the bedroom, and the two of them got into a dispute about S.B.'s activities that evening. Eventually, S.B. began to cry, and Mother then hit S.B. across the face, told her to stop crying, and walked out of the bedroom.

¶3     A little while later, Mother returned to S.B.'s room and told her to get up and go to the store with Whytock. S.B. told Mother she did not want to accompany Whytock on this errand, but Mother "yelled at [S.B.] some more" and told her "that [she] needed to go." In a report to police made a few days later, S.B. stated that she complied with Mother's request, and went to the store with Whytock. At trial, however, S.B. testified that she refused Mother's request, and that Whytock went to the store alone, while she stayed in her bedroom.

¶4     Later that evening, S.B. was in her bed trying to sleep. She testified that, after Whytock returned from the store, he entered her bedroom, got into her bed, and covered her mouth with his hand. He told her to "be quiet" and to take off her shorts and underwear, then he "spread [her] legs apart" and "put his penis inside [her] vagina." When S.B. began to cry, he told her to "stop crying" and that she "deserved it." Afterward, Whytock told S.B.

---

1. "We recite the facts in the light most favorable to the verdict, presenting conflicting evidence only as necessary to understand the issues on appeal." *State v. Salgado*, 2018 UT App 139, n.1, 427 P.3d 1228.

that if she "were to tell anybody, he'd come back and do it to [her] two little sisters."

¶5 A few days later, S.B. was at her father's (Father) house when Mother called her and threatened to take her phone away. S.B. testified that this frightened her, because she knew from past experience that "[w]henever [Mother] took [their] phones that's when she started hitting" S.B. and her sisters because they "couldn't call [their] dad to come get [them]." S.B. then called Mother's parole officer, who suggested she contact the police. Later that day, S.B. went to the police station and signed a written statement describing certain acts of child abuse perpetrated on her by Mother; the statement included a detailed description of some of the events that occurred on the night of the rape, including that Mother "hit [S.B.] across the face" and that Mother made S.B. go to the store with Whytock, whom she described as a "known drug dealer and user." But S.B. did not mention that Whytock had raped her.

¶6 After that, S.B. lived for a few months with Father, and then for a few months with her older sister. While she was living with her older sister, S.B. twice interacted with police on unrelated matters, but she did not inform them about the rape on either occasion. Meanwhile, S.B.'s younger sisters continued to live with Mother and Whytock. S.B. testified that she did not tell anyone about the rape for several months because her "two little sisters were still living with [Mother and Whytock] and [she] was too afraid to tell what happened, because [she] didn't know what was going to happen to them if [she] told."

¶7 In the spring of 2015, after living with her older sister for a few months, S.B. moved in with her stepfather (Stepfather). Soon thereafter, S.B. shared the details of the rape with Stepfather's mother. This was the first time S.B. had told anyone about the rape. A few weeks later, after S.B. was hospitalized for stomach pains, S.B. also told a social worker at the hospital, as

well as a number of doctors, about the rape. After that, S.B. reported the rape to police.

¶8 In or about April 2015, after S.B. told others about the rape, Whytock appeared at Stepfather's house and knocked on the door. Stepfather asked Whytock what he wanted, and Whytock responded that "he was the person involved . . . with [S.B.]," and that "he wanted [Stepfather] to have [S.B.] recant her statement."

¶9 After investigating the matter, police arrested Whytock, and the State charged him with one count of rape, a first-degree felony, and one count of tampering with a witness, a third-degree felony. The original charging document indicated that the tampering occurred in August 2014, and was presumably referring to the threat S.B. reported that Whytock had made—that if she told anyone about the rape he would harm her sisters. The State later amended the information, however, to widen the date range on the witness tampering charge to "between August 1, 2014 and April 30, 2015." This change was apparently intended to bring Whytock's doorstep conversation with Stepfather into play as another possible instance of witness tampering. But the State did not attempt to amend the information to add a second witness tampering charge.

¶10 After a preliminary hearing and some pretrial motions, the case proceeded to jury trial, where the State presented testimony from S.B., Father, Stepfather, Mother, and an investigating officer, all of whom testified as to the events outlined above. Mother—the State's final witness—had a history of addiction, and both she and Whytock had a criminal record. Prior to trial, the court ruled, in response to a motion made by Whytock, that no evidence of Whytock's criminal history would be introduced in front of the jury, at least not in the State's case-in-chief. Immediately before Mother's testimony, and outside the jury's presence, the prosecutor noted that Mother was a "loose

cannon" and requested a recess specifically to "give [Mother] the rules from the judge of not mentioning certain things" about Whytock. Immediately following the recess, Mother took the stand and, in response to certain background questions from the State, described her history of addiction and noted that she was currently wearing an ankle monitor. Just a minute or two later, in response to a question about whether she and Whytock resided together, Mother answered in the affirmative and then volunteered that she and Whytock had "started out at [her] dad's house" and she "got [Whytock] out on ankle monitor to [her] dad's house from the Salt Lake County Jail." Defense counsel immediately asked to approach the bench, and informed the court that he would like to "make a motion," and the court asked counsel to wait until the next break to do so. Counsel later asked the court to declare a mistrial, but the court denied the motion, expressing doubt that the jury had "even understood" the import of the passing comment, and concluding that the situation did not "rise[] to the level" that would implicate a mistrial. The court offered to give a "remedial instruction," but defense counsel declined the invitation.

¶11　When it was his turn to present evidence, Whytock called as witnesses his wife, an ex-girlfriend, a defense-team investigator, and three law enforcement officers. The theme of Whytock's defense was that no rape or post-rape threat occurred, and that S.B. was not credible when she testified otherwise. To bolster this defense, Whytock made two main points. First, Whytock thoroughly cross-examined S.B. and the State's other witnesses, pointing out a number of inconsistencies in the accounts S.B. had given at various times, including whether she went to the store with Whytock on the night of the rape and that she did not tell police about the rape in three different encounters with them. Second, Whytock raised a physical limitation defense, presenting evidence from his wife and ex-girlfriend that, because he was not completely functional sexually, he could not have committed the rape in the manner

S.B. described. The State called Mother as a rebuttal witness, and she testified that, in her experience, Whytock had suffered from no such dysfunction.

¶12 During closing argument, the State made only brief mention of the witness tampering charge, and referenced only the threat made to S.B. as the facts supporting that charge. In his closing argument, defense counsel stated that he was not sure whether the witness tampering charge was aimed at the threat made to S.B. or the doorstep conversation with Stepfather, but he addressed both possibilities during argument, even though he acknowledged that it "seem[ed] like" the State's argument was that "the tampering was with [S.B.]" rather than with Stepfather. With regard to the threat, counsel argued that "[i]f the rape didn't happen, the tampering didn't happen." And with regard to the doorstep conversation, counsel argued that Whytock was just asking for S.B. to be "truthful" and to take back any testimony, including the rape allegation, that was "false." The State made no mention of the witness tampering charge during its rebuttal argument. No party requested a jury instruction that would have clarified the set of facts—the August threat or the April conversation—at which the tampering charge was aimed.

¶13 After deliberation, the jury convicted Whytock on both counts.

ISSUES AND STANDARDS OF REVIEW

¶14 Whytock now appeals his convictions, and asks us to consider two issues. First, Whytock challenges the trial court's denial of his motion for a mistrial, a decision we review for abuse of discretion. *State v. Wach*, 2001 UT 35, ¶ 45, 24 P.3d 948. Second, Whytock argues that his counsel rendered constitutionally ineffective assistance in a number of respects. "When a claim of ineffective assistance of counsel is raised for the first time on appeal, there is no lower court ruling to review

and we must decide whether the defendant was deprived of the effective assistance of counsel as a matter of law." *Layton City v. Carr*, 2014 UT App 227, ¶ 6, 336 P.3d 587 (quotation simplified).[2]

ANALYSIS

I

¶15    We first discuss Whytock's challenge to the trial court's denial of his motion for a mistrial. Whytock notes that Mother's reference to having "got[ten] him out" of jail "on ankle monitor" was contrary to the trial court's pretrial order forbidding the State from introducing evidence of Whytock's criminal history, and argues that this statement prejudiced him. While we agree with Whytock that the statement should not have come into evidence, we conclude that the trial court did not abuse its discretion, under the circumstances presented here, in denying his motion for a mistrial.

¶16    A mistrial is strong medicine. "In view of the practical necessity of avoiding mistrials and getting litigation finished, [a] trial court should not grant a mistrial except where the circumstances are such as to reasonably indicate that a fair trial cannot be had and that a mistrial is necessary to avoid injustice."

---

2. Whytock also invokes the cumulative error doctrine but, because we discern no prejudicial error, that doctrine is inapplicable. *See State v. Killpack*, 2008 UT 49, ¶ 62, 191 P.3d 17 ("[B]ecause we have found no error in this case, the requirements of the cumulative error doctrine are not met."); *see also State v. Martinez-Castellanos*, 2018 UT 46, ¶ 39, 428 P.3d 1038 (stating that, "under the [cumulative error] doctrine, we will reverse a jury verdict or sentence only if the cumulative effect of the several errors undermines our confidence that a fair trial was had" (quotation simplified)).

*State v. Butterfield*, 2001 UT 59, ¶ 46, 27 P.3d 1133 (quotation simplified); *accord State v. Duran*, 2011 UT App 254, ¶ 33, 262 P.3d 468.

¶17 And once a court denies a motion for a mistrial, we extend a high level of deference to that decision, because trial courts are "in an advantaged position to determine the impact of courtroom events on the total proceedings." *State v. Allen*, 2005 UT 11, ¶ 39, 108 P.3d 730; *see also State v. Wach*, 2001 UT 35, ¶ 45, 24 P.3d 948 ("A trial court's denial of a motion for a mistrial will not be reversed absent an abuse of discretion."). Indeed, when reviewing a court's decision to deny a motion for a mistrial, "the prerogative of [an appellate] court is much more limited" than the discretion enjoyed by the trial court in evaluating the motion in the first instance. *Butterfield*, 2001 UT 59, ¶ 46 (quotation simplified). "Unless the record clearly shows that the trial court's decision [to deny a mistrial motion] is plainly wrong in that the incident so likely influenced the jury that the defendant cannot be said to have had a fair trial, we will not find that the court's decision was an abuse of discretion." *Id.* (quotation simplified); *accord State v. Silva*, 2019 UT 36, ¶ 36, 456 P.3d 718.

¶18 Our supreme court, after reviewing Utah appellate decisions, has noted that "a mistrial is not required where an improper statement is not intentionally elicited, is made in passing, and is relatively innocuous in light of all the testimony presented." *Allen*, 2005 UT 11, ¶ 40; *see also Butterfield*, 2001 UT 59, ¶ 47 (finding no abuse of discretion in the denial of a mistrial where the improper testimony was not intentionally elicited and was "vague" and "fleeting"); *State v. Decorso*, 1999 UT 57, ¶ 39, 993 P.2d 837 (finding no abuse of discretion in the denial of a mistrial motion where the improper testimony was "vague" and where "the proceedings move[d] along without undue interruption" following the testimony), *abrogated on other grounds by State v. Thornton*, 2017 UT 9, 391 P.3d 1061. Two cases in particular are especially relevant here.

¶19   In *Wach*, a defendant was accused of assaulting and kidnapping his mother, and the trial court made a pretrial ruling that no evidence of the defendant's previous bad acts would be admitted. 2001 UT 35, ¶ 19. During the mother's testimony, she volunteered information that implied that the defendant may have previously assaulted her. *Id.* The defendant moved for a mistrial, but the court denied the motion. *Id.* Our supreme court affirmed, stating that the mother's statement "was not elicited by the prosecutor, and was an isolated, off-hand remark, buried in roughly 244 pages of testimony," and concluding that this "isolated remark . . . did not render [the defendant's] trial so unfair that the trial court was plainly wrong in denying" the motion for a mistrial. *Id.* ¶ 46 (quotation simplified).

¶20   And in *Allen*, our supreme court held that a court had not abused its discretion in denying a motion for a mistrial when one of the State's witnesses made an unsolicited reference to the defendant being asked to "come in for a lie detector test." 2005 UT 11, ¶ 36. In analyzing the situation, the court listed six reasons that supported its decision to affirm: (1) the prosecutor did not intentionally elicit the statement; (2) the reference was "vague" and did not indicate that the defendant had passed or failed any lie detector test, only that he had been asked to take one; (3) the "reference was brief"; (4) after the statement, "the proceedings continued without undue interruption"; (5) the prosecutor brought "no further attention" to the statement; and (6) the trial court offered to give a curative instruction, which offer the defendant declined. *See id.* ¶ 43.

¶21   These cases compel a similar result here. In this case, the statement was not voluntarily elicited; indeed, the prosecutor asked for a recess, immediately prior to Mother's testimony, in order to remind her of the court's ruling and to instruct her not to say anything about Whytock's criminal history. And the question the prosecutor posed was a simple one about whether Mother had been living with Whytock; it was not a question

designed to elicit information about Whytock's criminal history. Indeed, during the argument on the mistrial motion before the trial court, defense counsel stated that he could not "fault[]" the prosecutor, and acknowledged that Mother "just volunteered" the information without being prompted. Moreover, Mother's statement was an isolated, off-hand remark and, after a brief sidebar conference, the trial proceedings continued thereafter without interruption. The State did not mention Mother's remark again during the trial, whether in examining other witnesses or in closing argument. And the trial court offered to give a curative instruction, but Whytock declined the offer.

¶22 Whytock asserts that these cases are not controlling here, because he contends that, in context, Mother's statement was less vague than the statements at issue in the other cases. Whytock emphasizes that, shortly before making her statement about Whytock, Mother had discussed ankle monitors and explained to the jury why she was wearing one that day. Whytock asserts that, under these circumstances, the jury must have understood that Mother's reference to getting Whytock "out on ankle monitor" from the jail meant that Whytock had been convicted of crimes serious enough to warrant a sentence that included electronic monitoring.

¶23 We take Whytock's point, and agree that there is a possibility that, given the context, at least some of the jurors may have understood the reference. But this is not necessarily grounds for a mistrial, especially given that Mother's passing reference to the existence of criminal activity by Whytock was cumulative of evidence that Whytock himself elicited from other sources. Early in the case, during cross-examination of S.B., Whytock's counsel admitted into evidence, and published to the jury, S.B.'s written statement to police in which she referred to Whytock as a "known drug dealer and user." Then, immediately following Mother's testimony, and before the trial court's ruling on the motion for a mistrial, Whytock called his wife as a

witness, and—for no apparent strategic reason—asked her whether Whytock had been "in jail" during "some of the time" she and Whytock had been living together in a particular location, and she answered in the affirmative.

¶24 When we examine the circumstances surrounding Mother's isolated and inadvertent statement, we cannot conclude that the trial court abused its discretion in denying Whytock's motion for a mistrial. As noted, the brief statement was made in passing, and was not elicited by the State. Following the statement, the proceedings continued with only a brief pause, and the State made no further mention of Whytock's criminal history generally or of Mother's statement in particular. And in addition, the jury learned from other sources that Whytock was a "known drug dealer" who had spent some time in jail, evidence that rendered Mother's inadvertent statement "relatively innocuous in light of all the testimony presented." *See Allen*, 2005 UT 11, ¶ 40. For all of these reasons, Whytock has not convinced us that "the incident so likely influenced the jury" that Whytock "cannot be said to have had a fair trial." *See Butterfield*, 2001 UT 59, ¶ 46 (quotation simplified). Accordingly, the trial court was not "plainly wrong" in denying Whytock's motion for a mistrial, *id.* (quotation simplified), and we therefore affirm the court's ruling.

II

¶25 Next, Whytock asserts that his trial attorneys rendered constitutionally ineffective assistance in two specific respects, both of which concern the witness tampering charge. First, Whytock contends that his attorneys should have taken various steps aimed at definitively ascertaining the actions for which he was being charged with witness tampering. Whytock claims that, by failing to take those steps, his attorneys left in place a situation in which the jury heard "two separate, distinct theories of liability regarding witness tampering, even though the State

only charged one count"—a situation in which a jury could have returned a non-unanimous guilty verdict in violation of the Utah Constitution. Second, Whytock claims that his attorneys rendered ineffective assistance by failing to object to a jury instruction regarding witness tampering that lacked specific discussion of the mens rea required to convict on such a charge. We discuss these arguments, in turn, after a brief discussion of the legal standards governing ineffective assistance claims.

A

¶26    To establish that his trial counsel rendered constitutionally ineffective assistance, Whytock must show both (1) that counsel's performance was deficient, in that it "fell below an objective standard of reasonableness," and (2) that counsel's deficient performance "prejudiced the defense" such that there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 687–88, 694 (1984); *see also State v. Scott*, 2020 UT 13, ¶ 28, 462 P.3d 350; *State v. Ray*, 2020 UT 12, ¶ 24. A defendant must satisfy both parts of this test in order to successfully establish ineffective assistance. Accordingly, it is unnecessary "for [a court] to address both components of the inquiry if we determine that a defendant has made an insufficient showing on one." *Archuleta v. Galetka*, 2011 UT 73, ¶ 41, 267 P.3d 232 (quotation simplified).

¶27    The first part of the test requires Whytock to show that counsel's performance "fell below an objective standard of reasonableness." *Scott*, 2020 UT 13, ¶ 31 (quotation simplified). In evaluating counsel's performance, courts often examine whether counsel had a strategic reason for taking the challenged action. *See id.* ¶ 35 ("[T]he performance inquiry will often include an analysis of whether there could have been a sound strategic reason for counsel's actions."). If counsel had a valid strategic reason for taking the action, "it follows that counsel did not

perform deficiently." *Id.*; *see also Ray*, 2020 UT 12, ¶ 34 ("If it appears counsel's actions could have been intended to further a reasonable strategy, a defendant has necessarily failed to show unreasonable performance.").

¶28 If Whytock establishes that trial counsel rendered deficient performance, he must next show that he was prejudiced by counsel's performance. Prejudice exists when there is a reasonable probability that the case would have had a different outcome had trial counsel not performed deficiently. *See State v. Garcia*, 2017 UT 53, ¶¶ 34–38, 424 P.3d 171. "[A] reasonable probability is a probability sufficient to undermine confidence in the outcome" of the proceeding. *Strickland*, 466 U.S. at 694. And in assessing whether this standard is met, we "consider the totality of the evidence before the judge or jury and then ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors." *Garcia*, 2017 UT 53, ¶ 28 (quotation simplified). A defendant attempting to show that there was a "reasonable probability of a different outcome" faces "a relatively high hurdle to overcome." *Id.* ¶ 44.

B

¶29 Whytock's first claim of ineffective assistance raises the specter of a non-unanimous verdict on the witness tampering charge. Because the State presented evidence of two separate instances of possible witness tampering, but charged him with only one count of witness tampering, Whytock contends that the jury's verdict could have been non-unanimous: if some (but not all) of the jurors considered him guilty because he threatened S.B., while others (but not all) considered him guilty for his statement to Stepfather, all of the jurors could have agreed that he was guilty of witness tampering even though not all of them were in agreement that he was guilty of any particular act of witness tampering.

¶30  Whytock's underlying legal argument is sound. The Utah Constitution provides that "[i]n criminal cases the verdict shall be unanimous." Utah Const. art. I, § 10. This requirement "is not met if a jury unanimously finds only that a defendant is guilty of a crime"; rather, "[j]ury unanimity means unanimity as to a specific crime and as to each element of the crime." *State v. Saunders*, 1999 UT 59, ¶ 60, 992 P.2d 951. Indeed, in *Saunders* our supreme court spun a hypothetical, stating that a guilty verdict would violate this constitutional principle "if some jurors found a defendant guilty of a robbery committed on December 25, 1990, in Salt Lake City, but other jurors found him guilty of a robbery committed January 15, 1991, in Denver, Colorado, even though all jurors found him guilty of the elements of the crime of robbery and all the jurors together agreed that he was guilty of some robbery." *Id.* In this hypothetical, the two different acts would be "distinct counts or separate instances of the crime of robbery, which would have to be charged as such." *State v. Hummel*, 2017 UT 19, ¶ 26, 393 P.3d 314; *see also State v. Alires*, 2019 UT App 206, ¶¶ 18–25, 455 P.3d 636 (holding that a verdict violated unanimity principles where a defendant was charged with "six identically-worded counts" of sexual abuse, the counts were not distinguished by act or alleged victim, the victims described more than six acts that could have qualified as abuse, and the jury convicted the defendant of only two counts; in such a situation, "the jurors could have completely disagreed on which acts occurred or which acts were illegal").

¶31  This case presents the *Saunders* hypothetical come to life. In this case, like the *Saunders* hypothetical, Whytock was charged with only one count of a crime, but the State put on evidence of two potential occasions on which he might have committed the crime, and made no effort—whether in the information, in the jury instructions, or in closing argument—to distinguish between the two occasions or indicate to the jury which factual occasion was the one being charged. In this case, as in *Alires*, "the jurors could have completely disagreed on which acts

occurred," and yet could have nevertheless convicted Whytock of witness tampering. *See Alires*, 2019 UT App 206, ¶ 23.

¶32 But Whytock did not bring the jury unanimity problem to the attention of the trial court at any point, either before or during trial. Accordingly, any objection he might now have about the issue is unpreserved, and we may review it only for plain error or for ineffective assistance of counsel, or under "exceptional circumstances." *See State v. Johnson*, 2017 UT 76, ¶ 19, 416 P.3d 443 ("This court has recognized three distinct exceptions to preservation: plain error, ineffective assistance of counsel, and exceptional circumstances."). On appeal, Whytock asks us to examine the issue through the lens of ineffective assistance of counsel, as we did in *Alires*. *See Alires*, 2019 UT App 206, ¶¶ 16–30 (determining that defense counsel rendered ineffective assistance "when he did not request an instruction regarding juror unanimity").

¶33 When a defendant asks us to examine an issue through the lens of ineffective assistance, that defendant will not prevail simply by demonstrating that there was an impropriety in the proceedings; he must show that his counsel rendered ineffective assistance. Sometimes an attorney might reasonably decide, as a matter of trial strategy, not to lodge a particular objection or bring an issue to the court's attention, even when the attorney believes a legal error has been made. *See State v. Ray*, 2020 UT 12, ¶¶ 31–32 (stating that "not objecting to an error does not automatically render counsel's performance deficient," and that an attorney is permitted to "pick his battles"); *State v. Larrabee*, 2013 UT 70, ¶ 27, 321 P.3d 1136 (stating that it is "axiomatic" that "there are times when counsel's decision not to object can be both strategic and proper"); *see also Strickland*, 466 U.S. at 689 (noting the "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," and stating that "there are countless ways to provide effective assistance in any given case").

¶34    In this case, even though Whytock has demonstrated that a jury unanimity problem existed, he cannot prevail on an ineffective assistance claim unless he can also show that his trial attorneys performed deficiently in failing to address that problem. Because, as noted above, his counsel's actions do not constitute deficient performance if they were "intended to further a reasonable strategy," *see Ray*, 2020 UT 12, ¶ 34, Whytock's claim fails if his counsel's actions had a reasonable strategic basis. In an effort to demonstrate deficient performance, Whytock identifies three actions that he believes his trial attorneys should have taken to address the jury unanimity problem. First, Whytock believes that his attorneys should have filed a motion, at some point after the State amended the information, seeking clarification about which act the State was charging as witness tampering. Second, Whytock asserts that his attorneys should have objected, pursuant to rule 404(b) of the Utah Rules of Evidence, to the admission of Stepfather's testimony about the conversation he had on his doorstep with Whytock. Third, Whytock contends that his attorneys should have asked for a mistrial after Stepfather's testimony was admitted.[3] We next examine whether counsel's failure to take these three specific actions constituted deficient performance.

1

¶35    First, Whytock contends that his attorneys performed deficiently by failing to file a motion seeking clarification of the

---

3. At oral argument before this court, Whytock's appellate counsel clarified that Whytock does not contend that his trial counsel performed deficiently by failing to request a jury instruction regarding the issue, such as an instruction telling the jury that it could convict on the witness tampering charge *only* for the alleged threat made at the time of the rape. Accordingly, we do not address that argument.

State's amended information regarding the witness tampering charge. But we can readily imagine a strategic reason why a trial attorney in this situation might not want to bring a motion seeking clarification of the amended information: the State would likely have responded to such a motion by seeking leave to file a second amended information charging Whytock with two counts of witness tampering rather than one. This strategy may have been particularly appealing in this case, where the rape charge was the main event and the witness tampering charge was the undercard. Given the close relationship between the rape allegation and the allegation that Whytock committed witness tampering by threatening S.B. following the rape, counsel could well have concluded that a jury willing to acquit Whytock on the rape charge would likely also acquit on the witness tampering charge, while a jury willing to convict Whytock of rape would probably also convict him of witness tampering, including two counts of it if both were charged. There was significant downside risk, given the dynamics of this case, to seeking clarification of the State's amended information, and counsel could reasonably have decided, for strategic reasons, to let the matter lie. Under such circumstances, we cannot conclude that counsel's performance in failing to seek clarification of the amended information was deficient under the *Strickland* standard.

2

¶36   Whytock next claims that his trial attorneys performed deficiently by failing to lodge an objection, pursuant to rule 404(b) of the Utah Rules of Evidence, to the admission of Stepfather's testimony about the doorstep conversation he had with Whytock in April 2015. Whytock asserts that the conversation was evidence of a "crime, wrong, or other act" separate from the crime charged, and therefore should have been excluded under rule 404(b) or rule 403.

¶37    As an initial matter, Whytock's assertion appears to be grounded in the assumption that the witness tampering count was not aimed at the April doorstep conversation, and that evidence of that conversation therefore constitutes evidence of a "crime, wrong, or other act" separate from the crime charged. But Whytock's entire overarching jury unanimity argument is premised on the theory that the witness tampering charge might have been aimed at that conversation; in that instance, the conversation would be evidence of a charged crime and therefore not rule 404(b) evidence.

¶38    But even if we assume, for the purposes of evaluating this specific argument, that the witness tampering charge was solely aimed at the August 2014 threat S.B. testified about, the April 2015 conversation still provided at least indirect evidence of a charged crime, because it implied a connection between Whytock and the alleged rape. In the conversation, as recounted by Stepfather, Whytock identifies himself as the person "involved" with S.B., a statement that could be interpreted in more than one way but that could be taken to mean that Whytock was acknowledging some involvement in the rape. While the statement could have been used for several purposes at trial, one potential purpose was to tie Whytock more substantively to the rape. And when used for that purpose, this conversation is not evidence of "other crimes," but instead constitutes evidence of Whytock's involvement in the charged rape itself. As such, it is not rule 404(b) evidence. Under these circumstances, had trial counsel made a motion seeking its exclusion, that motion would likely have been denied, and therefore trial counsel could reasonably have believed that any such motion would have been futile. *See State v. Ring*, 2018 UT 19, ¶ 43, 424 P.3d 845 (concluding that trial counsel did not render deficient performance where counsel "could have reasonably believed that an objection was futile"); *State v. Kelley*, 2000 UT 41, ¶ 26, 1 P.3d 546 (stating that "failure to raise futile objections does not constitute ineffective assistance of counsel").

¶39    On a related note, Whytock also asserts that trial counsel should have sought the conversation's exclusion pursuant to rule 403, which authorizes courts to exclude relevant evidence "if its probative value is substantially outweighed by a danger of," among other things, "unfair prejudice." *See* Utah R. Evid. 403. But as noted, the probative value of Stepfather's testimony was relatively high, whereas the risk of *unfair* prejudice was relatively low given the testimony's connection to charged conduct. *See State v. Wilson*, 2020 UT App 30, ¶ 30, 461 P.3d 1124 (stating that "all probative evidence is prejudicial to the party against whom it is introduced," but "such prejudice is not necessarily unfair" (quotation simplified)). Trial counsel could have reasonably concluded that any motion to exclude Stepfather's testimony pursuant to rule 403 would have also been futile.

¶40    Because Whytock's trial attorneys could have reasonably concluded that any efforts to exclude Stepfather's testimony about the April 2015 doorstep conversation would have been futile, counsel did not perform deficiently by failing to make such efforts. *Kelley*, 2000 UT 41, ¶ 26.

3

¶41    Finally, Whytock argues that trial counsel should have moved for a mistrial on the jury unanimity issue once the State put the doorstep conversation into evidence. But we think it unlikely that the trial court would have granted any such motion outright, and we think counsel could have made a reasonable strategic decision not to make such a motion.

¶42    As noted above, a mistrial is a drastic remedy that trial courts do not lightly grant, *see State v. Butterfield*, 2001 UT 59, ¶ 46, 27 P.3d 1133 ("A trial court should not grant a mistrial except where the circumstances are such as to reasonably indicate that a fair trial cannot be had and that a mistrial is necessary to avoid injustice." (quotation simplified)), and under

the circumstances presented here, we do not think it likely that the trial court would have granted such a motion outright. To be sure, there is a potential jury unanimity problem in this case, and the trial court would likely have taken steps to address the issue, if it had been brought to its attention. But counsel could have reasonably concluded that the steps the trial court would have taken would likely not have included declaring a mistrial.

¶43   In our view, the trial court would have most likely responded to such a motion not by declaring a mistrial but by addressing the unanimity issue through additional jury instructions about the scope and nature of the witness tampering charge. But as noted, Whytock does not argue that his counsel was ineffective for failing to seek additional instructions. Under these circumstances, we do not think Whytock's trial attorneys performed deficiently by failing to seek a mistrial, a remedy they could have reasonably concluded was unlikely to be awarded. As noted, when seeking particular relief would be futile, an attorney does not perform deficiently by failing to seek it. *Kelley*, 2000 UT 41, ¶ 26; *see also State v. Torres*, 2018 UT App 113, ¶ 16, 427 P.3d 550 ("Because the decision not to pursue a futile motion is almost always a sound trial strategy, counsel's failure to make a motion that would be futile if raised does not constitute deficient performance." (quotation simplified)).

¶44   Thus, valid strategic reasons existed for Whytock's attorneys to decline to seek clarification of the amended information, to fail to object to admission of the doorstep conversation, and to decline to seek the specific remedy of mistrial after that evidence came in at trial. Accordingly, Whytock has not demonstrated that his trial counsel performed deficiently by not attempting to remedy the jury unanimity problem by the specific means Whytock identifies in his appellate brief. He has therefore failed to satisfy the deficient performance element of a claim for ineffective assistance of counsel, and his first such claim fails on that basis.

C

¶45    Whytock's second ineffective assistance of counsel claim concerns itself not with jury unanimity but with the text of the jury instruction setting forth the elements of the crime of witness tampering. Whytock correctly points out that the witness tampering statute under which he was charged does not set forth any specific level of mens rea necessary for conviction, *see* Utah Code Ann. § 76-8-508 (LexisNexis 2019), and therefore the "default" level of mens rea applies, requiring the State to prove that Whytock acted with "intent, knowledge, or recklessness" in order to secure a conviction, *see id.* § 76-2-102. However, the witness tampering instruction provided to the jury in this case made no mention of the level of mens rea necessary to support a conviction, and Whytock therefore asserts that the instruction "thus allowed the jury to convict [him] of tampering as if it were a strict liability crime."

¶46    But even if we credit Whytock's argument that the jury instruction was faulty, and even if we assume, without deciding, that Whytock's trial attorneys performed deficiently by failing to bring the matter to the attention of the trial court, Whytock has nevertheless failed to demonstrate ineffective assistance of counsel, because he cannot show a reasonable probability of a different outcome if the instruction had been worded differently.

¶47    As the State points out, "[b]oth parties' theories [of the case] presupposed specific intent." For its part, the State asserted that Whytock had intentionally threatened S.B. after the rape, and asserted that Whytock had intentionally gone to Stepfather's house to urge him to "have [S.B.] recant her statement." At no point did the State propose to the jury that it could convict Whytock of witness tampering under a theory of negligence or strict liability. And Whytock defended the witness tampering charge by asserting that he did not threaten S.B. at all, and that his statement to Stepfather was simply meant to remind S.B. to

be "truthful" and to disavow any previous "false" statements she might have made; he never defended against the witness tampering charge by asserting that he had in fact tampered with a witness but had done so with a less culpable mental state.

¶48 When weighing whether prejudice exists, we "consider the totality of the evidence before the judge or jury and then ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors." *Garcia*, 2017 UT 53, ¶ 28 (quotation simplified). Under the circumstances presented here, where neither the State's case nor Whytock's defense made an issue of Whytock's level of intent, and where neither side asked the jury to make a decision based on a lesser mens rea, we do not discern a reasonable probability that the jury's verdict would have been any different if the jury instruction had made note of the fact that a mens rea of at least recklessness was required. *See State v. Geukgeuzian*, 2005 UT App 228U, para. 9 (determining that, even if counsel "had requested a jury instruction that included a mens rea element" on the witness tampering charge, "there is not a reasonable possibility that the result would change" given that the defendant's defense "was not that he did not intend to procure a false statement but that the statement was true"). Accordingly, Whytock cannot show prejudice, a necessary element of an ineffective assistance claim, *see Strickland*, 466 U.S. at 694, and his second such claim fails on that basis.

## CONCLUSION

¶49 The trial court did not abuse its discretion when it denied Whytock's motion for a mistrial related to Mother's inadvertent statement. And Whytock has failed to demonstrate that his trial attorneys rendered constitutionally ineffective assistance. Accordingly, we affirm Whytock's convictions.

————