2025 UT App 110

# THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
JAIRO EMMANUEL MERAZ-ZAMORANO,
Appellant.

Opinion
No. 20230067-CA
Filed July 10, 2025

Third District Court, Salt Lake Department
The Honorable Su Chon
No. 181910907

Nathalie S. Skibine and Brenda Viera,
Attorneys for Appellant

Derek E. Brown and Hwa Sung Doucette,
Attorneys for Appellee

JUDGE DAVID N. MORTENSEN authored this Opinion, in which
JUDGES MICHELE M. CHRISTIANSEN FORSTER and JOHN D. LUTHY
concurred.

MORTENSEN, Judge:

¶1     Jairo Emmanuel Meraz-Zamorano was charged with multiple counts of sexual abuse involving two minor girls—the grandchildren of his girlfriend. During voir dire, Meraz-Zamorano challenged several potential jury members for cause, but all the challenges were denied by the trial court. His counsel accordingly used peremptory challenges to strike these individuals. During trial, the mother of the girls mentioned that one of them had attempted suicide at the prospect of disclosing the alleged abuse. Considering this information was presented to the jury, Meraz-Zamorano's counsel made two motions for a mistrial, arguing that the information prejudiced Meraz-

Zamorano. His counsel also objected to video recordings of the girls' Children's Justice Center (CJC) interviews being played for the jury. On appeal, Meraz-Zamorano argues that the trial court erred in denying his for-cause challenges, in denying his motions for a mistrial, and in granting the State's motion to play the interviews. None of these claims are availing, and we affirm.

## BACKGROUND[1]

### *Revelation of Abuse*

¶2 Meraz-Zamorano began living with his girlfriend (Grandmother) around 2016. Living with them were Grandmother's son and his wife (Mother), along with their four children: Daisy (born in 2009), Iris (born in 2011), and two younger boys.[2]

¶3 In the fall of 2018, when Iris was seven years old, Grandmother was concerned that she seemed troubled. To get Iris to talk, Grandmother told her about a fictional "girl that had complained about" Meraz-Zamorano and said that if Meraz-Zamorano had "done something," Iris should tell her. Iris then told Grandmother that Meraz-Zamorano had been touching her in inappropriate ways. Grandmother asked Iris if the same thing was happening to Daisy, and Iris said that Meraz-Zamorano was doing "worse" things to her. A few days later, Grandmother had a similar conversation with Daisy. Daisy started crying and told Grandmother that Meraz-Zamorano sexually abused her. Around

---

1. "On appeal, we recite the facts from the record in the light most favorable to the jury's verdict and present conflicting evidence only as necessary to understand issues raised on appeal." *Layton City v. Carr*, 2014 UT App 227, ¶ 2 n.2, 336 P.3d 587 (cleaned up).

2. We employ pseudonyms for the children in this opinion.

that same time, Grandmother noticed a bite mark on Meraz-Zamorano's arm.

¶4     Shortly thereafter, Meraz-Zamorano and Grandmother got into an argument at a party. In the midst of the commotion, Grandmother told her brother, who was also at the party, about the allegations of sexual abuse the girls had made, and someone called the police. After Grandmother explained the situation to the responding officers, Meraz-Zamorano was arrested. A detective (Detective) spoke with Daisy and Iris separately in the early morning hours after Meraz-Zamorano had been arrested. With the help of Mother to translate, Detective confirmed that they reported abuse as Grandmother had indicated. Detective estimated that the interviews lasted about ten minutes. Detective then arranged for Daisy and Iris to be interviewed at the CJC.

*CJC Interviews and Meraz-Zamorano's Interview*

¶5     A few days later, in early October 2018, Detective conducted CJC interviews with Daisy and Iris.

¶6     Daisy said that on the first day of school that year, Meraz-Zamorano asked her to bring some coffee to him in a bedroom of the house. When she entered the room, he locked the door and pushed her onto the bed. Daisy told Detective that Iris then began knocking on the door and trying to get in. Daisy said that Meraz-Zamorano was "putting his thing on the front of [her] body." She also said that Meraz-Zamorano "got on top of [her] and he put his thingy inside of [her]." By "thing," Daisy clarified that she was referring to Meraz-Zamorano's "thing up front." She further revealed that the contact happened "[u]nder the clothes" she was wearing. When asked how this contact felt, Daisy said that she was "grossed out" and that her "front part" felt "sticky, . . . almost like glue." Daisy said that Meraz-Zamorano's "thing" had something that was "white," "slippery," "slimy," and "wet" on it. She clarified that "the white stuff [was] around his thingy" when he pulled it out of his pants. Eventually, Iris was able to open the

door, at which point Daisy said she bit Meraz-Zamorano and ran out of the room.

¶7     Daisy said that Meraz-Zamorano also touched her "private parts" the next day. She said that he used "[p]art of his hand" to touch "under [her] clothes . . . inside [of her] very strong on the front and on the back." When asked to clarify what she meant by back, Daisy said it was what she used "[t]o poop."

¶8     Finally, Daisy said that she was "afraid" to tell anyone about the abuse because Meraz-Zamorano had told her, "If you tell somebody I could kill your parents." When asked how she felt at the time of the interview, Daisy said she was still "scared" Meraz-Zamorano would come back and abuse her again. Detective reassured her by saying, "You know he's in jail right now."

¶9     In her interview, Iris initially said that she had not told Grandmother anything about Meraz-Zamorano's abuse. But when Detective reminded her that he had come to her house and talked with her and Daisy, she began disclosing the abuse Meraz-Zamorano inflicted on her. She said that Meraz-Zamorano had touched her a "lot of times." When asked what part of her body she was talking about, she said that it was her "privacy" and "[i]n [her] thingy" and that Meraz-Zamorano touched it with his hand on top of her clothes. Iris also recalled a time when Meraz-Zamorano locked himself and Daisy in his bedroom, and Iris opened the door with a hanger so Daisy could escape.

¶10    Detective interviewed Meraz-Zamorano about a week after the arrest. As relevant here, Detective testified that he had gone to the police precinct on the night of the arrest to interview Meraz-Zamorano but, because of a language barrier, he had to delay the interview for a week. Detective further stated that Meraz-Zamorano was transported to the precinct after his arrest because Detective "wanted to interview him at some point." In the interview, Meraz-Zamorano denied that the abuse happened,

but he admitted that "he played with the girls a lot" and there might have been a time when he touched their buttocks. Meraz-Zamorano also admitted that he had "touched the girls to check them medically."

*Initial Legal Proceedings*

¶11 Meraz-Zamorano was charged with one count of rape of a child, one count of lewdness involving a child, and two counts of aggravated sexual abuse of a child for his conduct involving Daisy, with the aggravating factors being (1) the use of force, duress, intimidation, coercion, menace, or threat of harm; (2) causing bodily or severe psychological injury; (3) being in a position of special trust; and (4) penetration of a genital or anal opening. Meraz-Zamorano was charged with three counts of aggravated sexual abuse for his conduct involving Iris, with the aggravating factors limited to (1) the use of force, duress, intimidation, coercion, menace, or threat of harm; (2) causing bodily injury or severe psychological injury; and (3) being in a position of special trust. *See Utah Code* § 76-5-404.3(2) (listing circumstances for aggravated sexual abuse of a child).

¶12 Before trial, the State filed a motion to admit the CJC interviews under rule 15.5(a) of the Utah Rules of Criminal Procedure, which provides the conditions for admitting previously recorded statements of children in cases concerning a charge of child abuse. The State clarified that it did not intend to play the CJC interviews as long as Daisy and Iris were able to testify. Meraz-Zamorano's counsel (Counsel) objected, arguing that the CJC interviews were not sufficiently reliable or trustworthy to be admitted in any event. More specifically, Counsel argued, "[T]he statements of the children were unreliable because they were influenced by the interviewer through challenge and repetition. Further, the statements were made after the children were questioned by [Detective] and various family members." Counsel also asserted that allowing the CJC

interviews to be played would "bolster the statements" of Daisy and Iris and "unfairly prejudice [Meraz-Zamorano] at his trial." The trial court ruled that the CJC interviews were admissible, finding that, "although not perfect," the interviews were "sufficiently reliable and trustworthy" to meet the threshold for admission. When Meraz-Zamorano's case was reassigned to a new judge, Counsel asked for reconsideration of the prior judge's ruling. Concluding that the original ruling was "not incorrect," the new judge denied the motion to reconsider.

¶13 As relevant here, Counsel raised seven for-cause challenges during jury selection. The trial court denied all these for-cause challenges. After voir dire, Counsel used six peremptory challenges to remove six of these challenged members, and the State used one of its peremptory challenges to remove the seventh. The trial court then empaneled eleven jurors to try the case, none of whom had been challenged for cause. Counsel affirmatively agreed she had selected the empaneled jury.

*Trial*

¶14 The State called Daisy, Iris, Mother, Grandmother, Detective, and several experts, whose relevant testimony we recount here.

¶15 Daisy, who was by this time twelve years old, testified that Meraz-Zamorano started abusing her when she was six years old. She said that Meraz-Zamorano started "getting . . . naked" around her to make her to feel "comfortable." She also revealed that Meraz-Zamorano started touching her arms, then moved to her chest, eventually moving to her "waist and to [her] front private." She said this touching occurred "multiple times" and "[m]ostly in his bedroom." She further testified that the touching began "over clothes" and then moved to touching "without clothes." She said that when she was seven, Meraz-Zamorano made her watch a movie with him while he was naked. Then, she said, he undressed

her and touched inside her "front private part" and her "butt" with his fingers. She further testified that Meraz-Zamorano "touched [her] with his front private part" when she was about nine years old. She explained that he had told her to get him some coffee, and when she brought it to his bedroom, he locked the door, undressed her and "put his penis inside" of her "front private part." She testified that this "hurt [her] a lot," that "white stuff" came out of his penis, and that she started crying loudly. Daisy said the abuse ended when Iris was able to unlock the door, enter the room, and bite Meraz-Zamorano in the arm.

¶16    Daisy also testified that she never told Mother about the abuse because she was "scared" that Meraz-Zamorano "was going to do something" to Mother. She said that Meraz-Zamorano would threaten her with a gun by putting a bullet in it and saying, "[Y]ou better not tell anybody or . . . I will end . . . your family's life and your sister's." However, Daisy testified that she eventually told Grandmother about the abuse after Iris had done the same.

¶17    During the cross-examination of Daisy, the court asked the prosecutor and Counsel whether the victim advocate should be moved closer to where Daisy was sitting because Daisy seemed "a little nervous." But the prosecutor thought it was best to get through her testimony as quickly as possible. The court agreed, but it asked whether Iris would benefit from having the victim advocate accompany her when she testified. The prosecutor said he would ask Iris what she would prefer to do, and Counsel did not object.

¶18    Iris, who was eleven years old at the time of trial, indicated that she would prefer to testify with the victim advocate next to her. Counsel did not object to this arrangement. Iris testified that Meraz-Zamorano had touched her "private" over her clothes more than five times with his hand. She also testified that on one occasion she heard Daisy screaming from behind a locked door.

She said that she unlocked the door and the two of them ran into another room and locked the door. Iris said she never talked to anyone about the abuse because Meraz-Zamorano threatened to "kill [her] family" if she did.

¶19    Mother testified that a few months before she learned of the abuse, she had noticed Daisy and Iris had become "really aggressive," "emotional," and prone to crying. She said they would hide behind her "every time they saw" Meraz-Zamorano. Mother also said Daisy had to be treated for blood in her urine and a UTI a few weeks before the abuse was revealed. She said that she helped translate for the girls when they were initially interviewed in the early morning hours after the party. She clarified that this was the first she learned of the abuse. The prosecutor asked Mother to describe the girls' behavior in "the immediate aftermath" of "when this all came out." The following exchange ensued:

> *Mother*: Okay. Well, they can't sleep at night. They always have nightmares. My oldest daughter, . . . she's been having suicidal thoughts. Once she tried to do it 'cause she was scared to come to court, so she tried to commit suicide.
>
> *Prosecutor*: How long ago was that?
>
> *Mother*: A month ago.

¶20    Counsel immediately objected and moved for a mistrial due to the "extremely prejudicial" nature of the revelation that Daisy had attempted suicide. "[T]he fact that she tried to commit suicide a month ago in preparation for this trial," Counsel argued, is not something "the jury should have heard." Counsel asserted that given the "incredibly" and "overwhelming[ly] prejudicial" nature of the revelation, a curative instruction would fall short, leaving a mistrial as the only remedy. The trial court denied the motion, noting that (1) the State did not intentionally elicit it, as evidenced by the "shocked" look of the prosecutor on hearing

Mother's response, and (2) Daisy's suicide attempt could be explained in various ways. As a remedy, the court provided a curative instruction to the jury to disregard that aspect of Mother's testimony.

¶21 Detective testified about his investigation into the abuse, including his CJC interviews with Daisy and Iris. On cross-examination, Counsel, quoting extensively from the transcript of the CJC interviews, challenged Detective on the way he questioned the girls. In particular, Counsel suggested that Detective was trying to get the answers he would need in order for the State to prosecute Meraz-Zamorano. Because Counsel challenged the way the CJC interviews were conducted, the State moved to introduce the videos themselves. The State argued that since Counsel had gone through "each interview line by line of the transcripts, . . . the easiest way to rebut [Counsel's suggestion] is to play the interviews of the children." Counsel responded that the cross-examination of Detective was to highlight deviations from interview protocol and allowing the video to be played would bolster the girls' testimony by repeating "recitations of the event themselves." The court ruled that the State could play the videos because the court had already determined they were admissible and to allow the State to rebut the assertion that the allegations were the result of "some kind of recent fabrication" arising from "improper influence or motive."

¶22 When Daisy's CJC interview was played, the following portion was inadvertently shown to the jury, despite a stipulation to redact this part of the video:

> *Detective*: Okay. So tell me how you feel now?
>
> *Daisy*: I'm scared.
>
> *Detective*: And tell me what you're scared of?
>
> *Daisy*: I don't know. Maybe [Meraz-Zamorano] getting back.

> *Detective*: Okay. And what scares you about [Meraz-Zamorano] getting back?
>
> *Daisy*: Like, he will do that again.
>
> *Detective*: Okay. You know he's in jail right now. Okay. Give me one more minute. Let me talk to my friends for a minute again.
>
> *Daisy*: Yeah.

After the video was played, Counsel again moved for a mistrial. Specifically, Counsel argued, "Considering the cumulative errors that have occurred in regard to this matter, including the . . . issue regarding the suicidal thoughts of [Daisy] on [the] first day of trial, and [the] supportive way in which [Iris] was brought before to testify, and now this information that [Meraz-Zamorano] was in custody, I believe that at this point that [Meraz-Zamorano] cannot have a fair trial and we ask for a mistrial." The State opposed the motion, arguing, "[T]here was talk [previously elicited] through Detective . . . that [Meraz-Zamorano] was in custody at the time that these interviews were happening, because he said they took him in custody and then he went and interviewed him later at . . . the police station." Moreover, the State noted that it was a brief statement made in the context of explaining why Daisy need not be afraid. The trial court denied the mistrial motion because there had "already [been] testimony regarding the fact" that Meraz-Zamorano was in custody right after his arrest and the CJC interviews "occurred at that same time." The court also ruled there was no cumulative error because it had already ruled that the CJC interviews were admissible and had "already addressed the issue about the suicide."

¶23 In his defense, Meraz-Zamorano called a retired law enforcement officer as an expert to address problems with the way the girls' interviews were conducted. The expert opined that the initial interviews with Daisy and Iris should have been recorded and conducted using "open-ended questions" and should not have involved Mother. Regarding the CJC interviews,

the expert also raised concerns about improper questioning techniques employed by Detective.

¶24    Meraz-Zamorano also took the stand in his own defense. He denied all the sexual abuse allegations. He testified that he and Grandmother were having problems because he was having an affair with another woman, which made Grandmother jealous. In closing, Counsel argued that it was jealousy that prompted Grandmother to claim that Daisy and Iris made allegations of sexual abuse against Meraz-Zamorano. Counsel further argued that Grandmother "made this accusation in the height of her anger against [Meraz-Zamorano] in a fight about" his infidelity.

¶25    The jury convicted Meraz-Zamorano on all seven counts. For the two counts of aggravated sexual abuse involving Daisy, the jury marked on special verdict forms all four potential aggravating factors identified in the jury instruction. *See supra* ¶ 11. For the three counts of aggravated sexual abuse involving Iris, the special verdict forms, apparently due to an oversight, again listed four potential aggravating factors when they should have listed only three: they mistakenly included penetration. Having received this incorrect form, the jury marked all four aggravating factors, seemingly much to the surprise of the trial court.

ISSUES AND STANDARDS OF REVIEW

¶26    Meraz-Zamorano appeals, arguing that the trial court erred when it denied his for-cause challenges to several prospective jurors, thus necessitating that he use all his peremptory challenges on those challenged venire members. "A trial court's determination of whether to excuse a prospective juror for cause should not be reversed absent an abuse of discretion." *State v. Maestas*, 2012 UT 46, ¶ 41, 299 P.3d 892 (cleaned up).

¶27    Meraz-Zamorano next asserts that the trial court "erred when it denied a motion and a renewed motion for a mistrial after events portraying the children as scared and Meraz-Zamorano as dangerous" were allowed to stand. We review a trial court's denial of a motion for a mistrial for abuse of discretion. *State v. Whytock*, 2020 UT App 107, ¶ 14, 469 P.3d 1150.

¶28    Meraz-Zamorano's third claim is that the trial court "erred when it granted the State's motion to introduce" the CJC interviews under rule 15.5 of the Utah Rules of Criminal Procedure. "Whether the trial court correctly admitted the videotaped interviews into evidence pursuant to rule 15.5 is a question of law that we review for correctness." *State v. Cruz*, 2016 UT App 234, ¶ 16, 387 P.3d 618.[3]

ANALYSIS

I. For-Cause Challenges

¶29    Meraz-Zamorano first argues that the trial "court erred when it denied the six challenges for cause that corresponded to the defense's six peremptory challenges during jury selection." Meraz-Zamorano argues that the six potential jurors should have instead been dismissed under the Utah Rules of Criminal Procedure. *See* Utah R. Crim. P. 18(e)(14) ("No person may serve

---

3. Meraz-Zamorano also asserts a claim of cumulative error. Our supreme court has "repeatedly held that the doctrine will not be applied when claims are found on appeal to not constitute error, or the errors are found to be so minor as to result in no harm. In other words, the doctrine will only be applied to errors that are substantial enough to accumulate." *State v. Martinez-Castellanos*, 2018 UT 46, ¶ 40, 428 P.3d 1038 (cleaned up). Because we conclude there are no errors to accumulate, the doctrine does not apply here.

as a juror, if challenged, unless the judge is convinced the juror can and will act impartially and fairly.").

¶30 Meraz-Zamorano asserts that the district court's denial of his for-cause challenges was prejudicial because there was "a reasonable likelihood of a more favorable result" if he had not been forced to use all his peremptory challenges on jurors who should have been removed for cause. More specifically, he argues that because the case hinged on witness credibility, he was prejudiced by having to use all his peremptory challenges on venire members who were assertedly biased toward or against a particular narrative: "In a case like Meraz-Zamorano's, having a hand in the jury composition—as opposed to using all peremptory challenges on jurors who should have been removed for cause—was reasonably likely to make a difference." Meraz-Zamorano further asserts that where "the jurors in [his] case found an uncharged aggravator three times, bias must have interfered with their ability to decide the evidentiary issues fairly based on the law provided."

¶31 "To prevail on a claim of error based on the court's failure to remove a prospective juror, a defendant must demonstrate that (1) the court erred when it failed to excuse a prospective juror for cause, *and* (2) the error prejudiced the defendant, or, in other words, that a member of the jury that was empaneled was partial or incompetent." *State v. Maestas*, 2012 UT 46, ¶ 41, 299 P.3d 892 (cleaned up).

¶32 For the purpose of our analysis, we will presume, without deciding, that the trial court abused its discretion in denying some or all of Meraz-Zamorano's for-cause challenges to venire members. But even if the court did so err, Meraz-Zamorano cannot show prejudice since none of the challenged individuals sat on the jury.

¶33 Defendants are required to show something beyond having to expend all their peremptory challenges to pursue a

claim of jury bias. And that something is prejudice. *See* Utah R. Crim. P. 30(a) ("Any error, defect, irregularity or variance which does not affect the substantial rights of a party shall be disregarded."). But prejudice cannot be shown in this context unless—at the very least—a challenged individual sat on the jury, a principle that is well established by Utah precedent. *See State v. Ellis*, 2020 UT App 119, ¶ 13 n.6, 473 P.3d 211 ("The loss of a peremptory challenge alone [is] not sufficient to prejudice a party and [does] not violate the constitution; in such cases, parties are required to demonstrate prejudice, i.e., to show that a member of the jury was partial or incompetent." (cleaned up)).

¶34 Decades ago, the Utah Supreme Court "reject[ed] the notion that the loss of a peremptory challenge constitutes a violation of the constitutional right to an impartial jury. So long as the jury that sits is impartial, the fact that the defendant had to use a peremptory challenge to achieve that result does not mean the Constitution was violated." *State v. Menzies*, 889 P.2d 393, 398 (Utah 1994) (cleaned up), *superseded on other grounds by constitutional amendment as stated in State v. Goins*, 2017 UT 61, 423 P.3d 1236. Thus, "to prevail on a claim of error based on the trial court's failure to remove a prospective juror for cause, a defendant must demonstrate prejudice, *viz.*, show that a member of the actual jury that sat was partial or incompetent." *State v. Wach*, 2001 UT 35, ¶ 24, 24 P.3d 948. In other words, an "error in not removing a juror for bias on a for-cause challenge [is] not per se reversible error"; instead, "for such an error to be reversible, actual prejudice [has] to be shown, and the expenditure of a peremptory challenge to remove a biased juror [is] not a sufficient showing of prejudice." *State v. Saunders*, 1999 UT 59, ¶ 52, 992 P.2d 951. And again, "Even upon finding that a trial court erroneously excluded a juror for cause, we will not reverse the jury verdict if we find the error was harmless. To show prejudice, [an] appellant must demonstrate that the jury that actually sat for the trial was in some way partial or incompetent." *State v. Calliham*, 2002 UT 86, ¶ 47, 55 P.3d 573 (cleaned up). In other words, even when there

are "erroneous for-cause rulings," the key determination is still "whether there is sufficient prejudice in the circumstances of the case to require a reversal of a conviction." *Saunders*, 1999 UT 59, ¶ 55.

¶35    Here, no individual that Meraz-Zamorano challenged for cause actually sat on the jury. This circumstance is fatal to any automatic claim of prejudice based on the forced use of all peremptory challenges to remove biased venire members. Meraz-Zamorano cannot prove prejudice simply because he had to use all his peremptory challenges on potential jurors that the trial court passed in spite of his for-cause challenges. In other words, to "demonstrate prejudice"—in addition to having exhausted his peremptory challenges—Meraz-Zamorano still must "show that a member of the jury was partial or incompetent." *Menzies*, 889 P.2d at 398. Since no jurors Meraz-Zamorano thought should have been removed for cause actually served on the jury, Meraz-Zamorano must find jury bias or some other form of actual prejudice grounded in a circumstance apart from the exhaustion of his peremptory challenges.

¶36    Meraz-Zamorano attempts to show prejudice by pointing to the fact that the jury checked the box for an aggravating factor that should not have been included on the special verdict form for the three counts involving the sexual abuse perpetrated against Iris. Meraz-Zamorano argues that in doing so, "the jury based its verdict on something other than the facts presented." But this assertion of prejudice is unavailing. After all, "a defendant seeking a new trial because of alleged juror bias has the burden to prove actual, not suppositional, bias." *State v. Wilder*, 2016 UT App 210, ¶ 15, 387 P.3d 512, *aff'd*, 2018 UT 17, 420 P.3d 1064. An equally, and perhaps more, likely explanation here is that the jury checked the box for the misplaced aggravator not because of bias but because the trial court supplied it with a faulty special verdict form. The misapplied aggravator was just as likely the result of inattention of the lawyers and the judge as it was of juror bias.

Meraz-Zamorano also claims that he was prejudiced because he had to use all his "peremptory challenges in a child sex case that hinged on credibility." But the same could be said for many cases involving the sexual abuse of a child. Because Meraz-Zamorano's assertions of bias are based on "generalized complaints," *State v. Aguilar*, 2022 UT App 97, ¶ 34, 516 P.3d 768, and supposition, *Wilder*, 2016 UT App 210, ¶ 15, his claim of prejudice here necessarily fails.

¶37 In sum, because Meraz-Zamorano has not demonstrated that he was harmed by the allegedly improper denial of his for-cause challenges—and instead articulates only generalized grievance and unfounded speculation—his first claim of error fails.

## II. Mistrial Motions

¶38 Meraz-Zamorano next asserts that the trial court erred in denying his motions for a mistrial. Meraz-Zamorano made two motions for a mistrial. The first occurred after Mother's reference to Daisy's attempted suicide, and it was limited to that issue alone. The second was made after the CJC interview was played, in which Detective mentioned Meraz-Zamorano was in jail. That motion pointed to "cumulative errors" during the trial. Meraz-Zamorano now claims that a "prejudicial theme" emerged from the combination of three circumstances: (1) Mother saying that Daisy attempted suicide because she was scared about coming to court, (2) the State playing a short section of Daisy's CJC interview in which Detective told Daisy she did not need to be afraid of Meraz-Zamorano because he was in jail, and (3) Iris having a victim advocate near her during her trial testimony. He asserts that the issues supporting his motions for a mistrial could not be considered fleeting or passing because, when taken together, they "developed a theme that Meraz-Zamorano was scary and that the children needed protection," resulting in a situation that was "unduly prejudicial and warranted a mistrial." Thus, Meraz-

Zamorano claims the trial court should have granted a mistrial because these circumstances indicated that a fair trial could not be had.

¶39     When a "court denies a motion for a mistrial, we extend a high level of deference to that decision, because trial courts are in an advantaged position to determine the impact of courtroom events on the total proceedings." *State v. Whytock*, 2020 UT App 107, ¶ 17, 469 P.3d 1150 (cleaned up). "In exercising its discretion, and in view of the practical necessity of avoiding mistrials and getting litigation finished, the trial court should not grant a mistrial except where the circumstances are such as to reasonably indicate that a fair trial cannot be had and that a mistrial is necessary to avoid injustice." *State v. Butterfield*, 2001 UT 59, ¶ 46, 27 P.3d 1133 (cleaned up). "On appeal, the prerogative of a reviewing court is much more limited. Unless the trial court's determination is plainly wrong in that the incident so likely influenced the jury that the defendant cannot be said to have had a fair trial, we will not find that the court's decision was an abuse of discretion." *State v. Wach*, 2001 UT 35, ¶ 45, 24 P.3d 948 (cleaned up). And it is well established that "a mistrial is not required where an improper statement is not intentionally elicited, is made in passing, and is relatively innocuous in light of all the testimony presented." *State v. Allen*, 2005 UT 11, ¶ 40, 108 P.3d 730; *see also Butterfield*, 2001 UT 59, ¶ 47 (concluding a trial court did not abuse its discretion for denying a motion for a mistrial based on a "vague, fleeting remark that was not elicited by the prosecutor" (cleaned up)); *Wach*, 2001 UT 35, ¶ 46 ("Our review of the record indicates that [the challenged] statement . . . was not elicited by the prosecutor, and was an isolated, off-hand remark, buried in roughly 244 pages of testimony."); *State v. Decorso*, 1999 UT 57, ¶¶ 38–40, 993 P.2d 837 (concluding that a trial court's denial of a motion for a mistrial based on an improper reference to the defendant's "other crimes" was not "plainly wrong" since the reference was innocuous, insignificant, and vague), *abrogated on other grounds by State v. Thornton*, 2017 UT 9, 391 P.3d 1016. In

short, to obtain a mistrial, a "defendant must make some showing that the verdict was substantially influenced by the challenged testimony," *State v. Velarde*, 734 P.2d 440, 448 (Utah 1986), and that task is extremely difficult when the challenged testimony is vague or made in passing.

¶40    We address each of Meraz-Zamorano's bases for a mistrial in turn.

A.    Mention of Suicide Attempt

¶41    Meraz-Zamorano argues that Mother's mention of Daisy's suicide attempt prejudiced him sufficiently to justify a mistrial. But Mother's statement was not intentionally elicited, was made in passing, and was relatively innocuous in light of the other testimony that had been presented. The prosecutor had asked Mother how the girls were doing in the immediate aftermath of the abuse. Mother explained that they had trouble sleeping, that Daisy had experienced suicidal thoughts, and that Daisy had attempted suicide about a month before the trial. Mother's brief mention of Daisy's suicidal thoughts and suicide attempt was made in passing, and the State did not dwell on it. Moreover, after Counsel had drawn the court's attention to the potential impropriety of the statement, the court provided a curative instruction directing the jury to disregard Mother's mention of Daisy's suicide attempt and related ideation. "We normally presume that a jury will follow an instruction to disregard inadmissible evidence inadvertently presented to it, unless there is an overwhelming probability that the jury will be unable to follow the court's instructions, and a strong likelihood that the effect of the evidence would be devastating to the defendant." *State v. Harmon*, 956 P.2d 262, 273 (Utah 1998) (cleaned up). This presumption is well-established. *See State v. Hodges*, 517 P.2d 1322, 1324 (Utah 1974) ("In the absence of the appearance of something persuasive to the contrary, we assume that the jurors were conscientious in performing to their duty, and that they followed

the instructions of the court."); *State v. Wright*, 2013 UT App 142, ¶ 42, 304 P.3d 887 ("In the absence of any circumstances suggesting otherwise, courts presume that the jury follows [curative] instructions."); *State v. Winward*, 941 P.2d 627, 635 (Utah Ct. App. 1997) ("[A] curative instruction . . . is ordinarily presumed on appeal to be effective."). Thus, in order to show that the trial court abused its discretion in denying his motion for a mistrial based on Mother's reference to Daisy's suicide attempt, Meraz-Zamorano must allege facts showing that Mother's comment so tainted the jury that he was denied a fair trial. Apart from speculation about the comment creating an image that Meraz-Zamorano was someone from whom the girls needed protection, he has not done so. Accordingly, we cannot conclude he was prejudiced such that there is a reasonable probability that hearing Mother's statement denied him a fair and impartial trial.

B.     Mention of Meraz-Zamorano Being in Custody

¶42     Counsel also argued for a mistrial because Detective's mention of Meraz-Zamorano being in custody was "inherently prejudicial" and "presumptively presum[ed] him guilty." But the jury already knew that Meraz-Zamorano was in custody at the time of the CJC interviews. Detective testified at trial that Meraz-Zamorano was arrested and taken to the precinct because Detective intended to interview him about the allegations. The CJC interviews took place a few days after the allegations were reported. Thus, it would have come as no surprise to the jury to hear that Meraz-Zamorano was in custody when the CJC interviews took place. Given that Detective's statement was merely cumulative of evidence that had already been presented without objection, we see no grounds for a mistrial based on this passing statement. *See Whytock*, 2020 UT App 107, ¶ 23 ("But this is not necessarily grounds for a mistrial, especially given that [the witness's] passing reference to the existence of criminal activity by [the defendant] was cumulative of evidence that [had already been] elicited from other sources."). In other words, the

challenged segment of the CJC interview merely repeated what the jury already knew. Therefore, it was "relatively innocuous," *see Allen*, 2005 UT 11, ¶ 40, and Meraz-Zamorano's claim of prejudice fails.

### C.     Presence of Victim Advocate

¶43    Meraz-Zamorano suggests that having the victim advocate accompany Iris during her testimony contributed to a prejudicial narrative against him. This aspect of his argument is simply without legal foundation. As Meraz-Zamorano acknowledges, Daisy was "in tears" throughout her testimony. It was thus obvious that it would also be difficult for the younger Iris to testify about the abuse she had suffered at the hands of Meraz-Zamorano. Utah law states, "[I]t is necessary to provide child victims and child witnesses with additional consideration and different treatment than that usually afforded to adults. . . . The treatment should ensure that children's participation in the criminal justice process be conducted in the most effective and least traumatic, intrusive, or intimidating manner." Utah Code § 77-37-1(2). In applying this statute, our supreme court has determined that it is "clearly within the discretion afforded the trial court" to allow an adult to accompany a child victim of sexual abuse during testimony. *See State v. Billsie*, 2006 UT 13, ¶ 15, 131 P.3d 239; *see also id.* ("In this case, the victim was an eight-year-old child at the time of trial. The trial court determined that the victim was in need of comfort or support in order to testify, due to her young age and sensitivities. Allowing an adult to accompany the child-victim while she testified was well within the discretion of the court."). Instead of calling our attention to any actual prejudice stemming from the presence of the victim advocate during Iris's testimony, Meraz-Zamorano would have us presume prejudice based on the speculative impact of the victim advocate's presence. We simply will not accept that invitation, especially in light of our legislature's express desire to facilitate the testimony of child victims in "the most effective and least

traumatic, intrusive, or intimidating manner." Utah Code § 77-37-1(2)(b).

D.     Cumulative Effect of Alleged Errors

¶44     Regarding Meraz-Zamorano's contention that the cumulative effect of Mother's statement, Detective's statement, and the presence of the victim advocate during Iris's testimony requires a mistrial, Meraz-Zamorano has failed to show that he was prejudiced. First, the curative instruction regarding the suicide reference adequately addressed the possible prejudice stemming from Mother's statement. Second, Detective's statement merely repeated information that the jury already knew. Third, the presence of the victim advocate was entirely proper, so Meraz-Zamorano has no basis for prejudice on that circumstance. Accordingly, even when taken together, we are unpersuaded that Meraz-Zamorano was so prejudiced as to result in an unfair trial.

¶45     In sum, we detect no abuse of discretion in the trial court's denial of Meraz-Zamorano's mistrial motions.

### III. CJC Interviews

¶46     Meraz-Zamorano next argues that the trial court erred in permitting the State to introduce the CJC interviews, arguing that they were unreliable under rule 15.5 of the Utah Rules of Criminal Procedure, which, as relevant here, provides,

> In any case concerning a charge of child abuse or of
> a sexual offense against a child, the oral statement
> of a victim or other witness younger than 14 years
> of age which was recorded prior to the filing of an
> information or indictment is, upon motion and for
> good cause shown, admissible as evidence in any
> court proceeding regarding the offense if . . . the
> court views the recording before it is shown to the

> jury and determines that it is sufficiently reliable and trustworthy and that the interest of justice will best be served by admission of the statement into evidence.

Utah R. Crim. P. 15.5(a)(8).

¶47 Meraz-Zamorano argues that the CJC interviews were not sufficiently reliable to be admitted because they were not conducted using best practices, the girls were prompted to arrive at their accusations, and the girls' statements in the interviews were tainted since the interviews were conducted after Grandmother had talked to the girls and after the girls had talked to each other and since Detective conducted unrecorded interviews prior to the recorded CJC interviews. Meraz-Zamorano asserts that allowing the CJC interviews to be played was prejudicial because the jury heard the allegations twice, and such "repetition amounted to improper bolstering," which he asserts was especially harmful since "this case amounted to a credibility contest."

¶48 We reject this claim of error for two reasons. First, Counsel made the asserted unreliability of the CJC interviews the central point of her presentation at trial. Rather than merely making the unreliability argument, Counsel quoted extensively from the transcript of the CJC interviews in cross-examining Detective and challenging Detective on the way he questioned the girls. It was in this context that the trial court granted the State's motion to play portions of the interviews. The court reasonably concluded that because Counsel had used transcripts of the interviews to suggest Detective had employed improper questioning techniques to influence the girls' responses, the State could, in turn, play the videos to allow the jury to hear the questioning and observe the "demeanor" and "attitude" of the girls during the interview session. We agree with the trial court. Because Counsel used the transcripts to support her assertion that the interviews

were conducted in a coercive manner, it was only fair that the State should be allowed to use the videos—which had already been determined to be sufficiently reliable to be admissible—to address that alleged defect. *See State v. Johnson*, 2016 UT App 223, ¶ 63, 387 P.3d 1048 (stating that fairness requires "allowing the State to introduce enough of the written statement to not only counter defense counsel's tactical attacks on specific elements of [a victim's] testimony but also to fairly respond to his strategic aim of impeaching [a victim's] credibility generally").

¶49  Second, we are not convinced that Meraz-Zamorano was prejudiced by the playing of the interviews. In other words, even if the CJC interviews should not have been admitted, there is not a reasonable likelihood of a different result absent their admission. *See State v. Northrup*, 756 P.2d 1288, 1295 (Utah Ct. App. 1988) ("A substantial right of a party is affected if, viewing the evidence as a whole, there is a reasonable likelihood a different result would have been reached absent the error."); *see also Anderson v. Larry H. Miller Commc'ns Corp.*, 2015 UT App 134, ¶ 17, 351 P.3d 832 ("[E]rror in the district court's evidentiary rulings will result in reversal only if the error is harmful.").

¶50  Here, "the graphic nature" of the girls' description of Meraz-Zamorano's sexual abuse "guaranteed that jurors would remember it—perhaps despite their best efforts—with or without []watching the CJC video recordings." *State v. Cruz*, 2016 UT App 234, ¶ 46, 387 P.3d 618. At trial, Daisy spoke in detail about Meraz-Zamorano putting his penis and fingers inside her "front private part" and that "white stuff" came out of his penis. At trial, Iris also described Meraz-Zamorano touching her "private" "front part" with his hand. Given the graphic and detailed testimony the girls offered at trial, any bolstering created by the CJC interviews' repetition of the abuse Meraz-Zamorano inflicted on them was minimal—certainly falling far short of creating a reasonable likelihood of a different result had the CJC interviews not been played.

¶51   Meraz-Zamorano's claim that the trial court erred in admitting the CJC interviews fails because the evidence was properly admitted and because Meraz-Zamorano cannot show how he was harmed by its admission.

CONCLUSION

¶52   Meraz-Zamorano's claim with respect to the for-cause challenges being denied fails for lack of prejudice. Moreover, the trial court did not abuse its discretion in denying Meraz-Zamorano's mistrial motions. Finally, Meraz-Zamorano's assertion that the trial court erred in permitting the introduction of the CJC interviews fails for lack of prejudice and because their admission was proper under the circumstances of this case.

¶53   Affirmed.

_____